THE STATE OF OHIO, APPELLEE, v. OVIEDO, APPELLANT.

(No. WD-81-27—Decided March 12, 1982.)

*Ms. Betty Montgomery,* for appellee.

*Ms. Julia Casey,* for appellant.

WILEY, J. The appeal herein is from a judgment of the Court of Common Pleas of Wood County entered May 26, 1981, wherein the defendant was sentenced for the offense of murder, a violation of R.C. 2903.02, to be imprisoned in the Columbus Correctional Facility for an indefinite term of a minimum of fifteen years and a maximum term of life.

The alleged offense occurred on November 16, 1980, at which time the defendant-appellant, Arthur James Oviedo (hereinafter referred to as the "appellant"), was a little over seventeen years of age, having been born on the 27th day of July, 1963.[1] About 12:15 to 12:30 a.m., on November 16, 1980, the appellant and five other male persons, one of whom was an adult, attempted to enter premises known as the Uptown-Downtown Bar located in Bowling Green, Ohio. Four of the six were refused entrance by an employee of the bar, one of Steven Bowers, the victim herein. The reason for the refusal was that they did not have proper identification. These four later entered the premises by the back door without permission and thereafter confronted Steven Bowers inside the premises. An altercation took place during which several bottles of beer were thrown at Bowers and Rich Kohler, the manager of the bar. Thereupon, Bowers, having previously asked the youths to leave, pushed them through the rear door, at which time Bowers and the youths became entangled and physical violence took place. The end result was that Steven Bowers was beaten with certain brass knuckles and stabbed several times, as a result of which stab wounds he died. The appellant was apprehended later the same morning.

Pursuant to R.C. 2151.26, Juv. R. 29 and 30, proceedings were had in the Juvenile Court of Wood County.

The first of ten assignments of error is stated:

"1. The trial court lacked jurisdiction to hear the case at bar because the transfer of jurisdiction was contrary to law and denied appellant fundamental fairness and due process of law in violation of Article I, Section 16 of the Ohio Constitution and the Fourteenth Amendment to the Constitution of the United States."

The record indicates that the court conducted an adjudicatory hearing required by Juv. R. 29 and proceedings for the transfer of jurisdiction as required by Juv. R. 30. At the preliminary hearing required by Juv. R. 30, the court determined that there was probable cause to believe that the appellant committed the act alleged; that such act would be a felony if committed by an adult; and by stipulation that the juvenile was over fifteen years of

---

[1] The complaint alleged that the birth date was July 23, 1963. However, at the proceedings in juvenile court on November 25, 1980, it was stipulated by counsel that the date of birth of the appellant was actually July 27, 1963.

age. The court continued the proceedings for a full investigation. The investigation included a mental and physical examination of the appellant by the Ohio Youth Commission. Thereafter, a further hearing was held to determine whether to transfer jurisdiction. Specifically, the appellant contends that the record does not disclose any basis for the finding required by Juv. R. 30(C) that the appellant was not amenable to rehabilitation in any juvenile facility. We disagree. Juv. R. 30 provides, in pertinent part:

"(C) Prerequisites to transfer. The proceedings may be transferred if the court finds there are reasonable grounds to believe:

"(1) . The child is not amenable to care or rehabilitation in any facility designed for the care, supervision and rehabilitation of delinquent children; and

"(2) The safety of the community may require that the child be placed under legal restraint for a period extending beyond the child's majority.
"* * *

"(E) Determination of amenability to rehabilitation. In determining whether the child is amenable to the treatment or rehabilitative processes available to the juvenile court, the court shall consider:

"(1) The child's age and his mental and physical health;

"(2) The child's prior juvenile record;

"(3) Efforts previously made to treat or rehabilitate the child;

"(4) The child's family environment; and

"(5) School record.
"* * *

"(G) Order of transfer. The order of transfer shall state the reasons therefor."

The judgment entry transferring the appellant from the juvenile court division to the court of common pleas fully complied with the Juvenile Rules and also fully complied with the requirements set forth in *Kent* v. *United States* (1966), 383 U.S. 541 [40 O.O.2d 270], and in *In re*

*Gault* (1967), 387 U.S. 1 [40 O.O.2d 378]. The pertinent parts of the judgment entry of the juvenile court state:

"It is the finding that Arthur James Oviedo, born the 23rd day of July, 1963, and being 17 years of age, that he probably committed the act alleged in the complaint filed in this matter, and that such act if committed by an adult would be a felony; and, it is further found that pursuant to an order of this Court, Arthur James Oviedo has had a mental and physical exam as required by Rule 30 of the Juvenile Rules of procedure [*sic*], and the Court has given full consideration to the child's age, his mental and physical ability, his prior juvenile record, efforts previously made to treat and rehabilitate him, family [*sic*], environment, school record, and other matters of evidence.

"It is further found that Arthur James Oviedo is not amenable to the care or rehabilitation in any facility designed for the care, supervision, and rehabilitation of delinquent children; and, the safety of the community requires that he be placed under legal restraint for a period extending beyond the child's majority."

The record further reveals that at the hearing on December 31, 1980, after the completion of the investigation pursuant to Juv. R. 30(D), the report of the Ohio Youth Commission relative to the mental and physical examination of the appellant was before the court; the school records were before the court; counsel for the defense made reference to the previous contacts that the appellant had had with the court.

The school records contain, in part, references to the poor, but passing, grades of the appellant and repeated suspensions for tardiness; on February 5, 1979, the appellant was expelled from the Perrysburg Public Schools for a period beginning February 6, 1979, to and including June 6, 1979, for excessive tardiness. The school record also indicates a three-day suspension for a first offense for fighting, the suspension being from

January 22, 1979, to January 24, 1979, inclusive.

The psychological report from the Scioto Village Diagnostic Unit of Powell, Ohio, a diagnostic center of the Ohio Youth Commission, indicates, among other facts, that the appellant had a history of delinquency dating back to January 1979, and included such charges as petty theft, breaking and entering, receiving stolen property, theft, criminal mischief and criminal damaging. For some of these offenses appellant had been placed on probation, but other unspecified charges were eventually dismissed. This report further reveals that the appellant had been at the Scioto Village Diagnostic Unit in September 1979, and was given a full study at that time, including a psychological examination. This report also indicates that the appellant continued to live with his parents in Perrysburg, Ohio. This court takes judicial notice of the fact that Perrysburg, Ohio, is a small city approximately ten to fifteen miles from Bowling Green, the place where the alleged offense involved herein was committed. The diagnostic unit report further reveals that the appellant had finished the eighth grade "and historical material indicates that he is in the ninth grade for 'the third time' * * *. He claimed one of the reasons he did not do better in school was that he was 'always fighting with the teachers.' " The report further reveals that the appellant indicated that "he had smoked pot for about two years, at least, and admitted to some consumption of alcohol, although he denied that he was addicted to either of these substances. He denied ever using pills or hard drugs in any form.

"Asked about prior contacts with the court, Arthur said he had been in contact with the police 'about 20 times.' "

The report further indicated that intellectually the appellant was functioning within the bright normal limits with a full-scale IQ score of 110. The psychologist who had examined the appellant recommended that the appellant be handled as a juvenile rather than as an adult in that he had never previously been given the opportunity for rehabilitation in a Youth Commission facility. He further stated, in part:

"The boy does need a period of rehabilitation that includes reasonable structure, guidance, and supervision by adequate male figures, as well as individual and group counselling. He also needs to be involved in a vocational program of some sort which will help him attain and sustain economic independence once he returns to the community. * * * Hopefully, if possible, a therapist with a personal cultural background in Mexican-American systems and values (*e.g.*, one who has been through what Arthur is currently going through) could be obtained to help Arthur in an on-going way, whatever placement might be decided for him by the court. Placement in an adult correctional facility would be seen as detrimental both physically and mentally to Arthur, and would be counterproductive to the community in the long run. * * *"

It has been held, and we so hold, that upon consideration of the five factors set forth in Juv. R. 30(E) relating to the determination of amenability to rehabilitation, not all of the relevant factors need be resolved against the juvenile in order to justify the transfer, nor is the court required "to make an arithmetic-type calculation as to the weight given by it to each factor." See *Hazel* v. *State* (1971), 12 Md. App. 144, 277 A. 2d 639, 645. See, also, *Kent* v. *United States* (C.A. D.C. 1968), 401 F. 2d 408.

We note that the court must not only determine that the court has reasonable grounds to believe that the child is not amenable to care or rehabilitation in any facility designed for the care, supervision, and rehabilitation of delinquent children, but also find reasonable grounds to believe, "[t]he safety of the community may require that the child be placed under legal restraint for a period extending

beyond the child's majority." In the absence of specific guidelines in regard to this second factor, it is appropriate for the court to consider the nature of the offense, the existence of aggravating circumstances, and the extent of any apparent pattern of anti-social conduct. See Young & Carr, 2 Anderson's Ohio Family Law, Juvenile Court Practice and Procedure 179, Section 9.54. See, also, *State* v. *Hogan* (1973), 297 Minn. 430, 212 N.W. 2d 664, 669. This court disagrees with the holding of *State* v. *Reuss* (Aug. 7, 1981), Wood App. No. WD-81-26, unreported (Potter, J., dissenting).

Upon full consideration of the record in regard to the transfer of proceedings, we determine that the first assignment of error is found not well-taken.

The second assignment of error states, as follows:

"The trial court erred in denying appellant's motion to sever his trial from that of his co-defendant, and allowing his co-defendant's statement to be used without deleting statements prejudicial to appellant."

This assignment of error is, likewise, found not well-taken for the following reasons:

The record reveals that the motion of appellant to sever his trial from that of his co-defendant pursuant to Crim. R. 14 was not timely filed in that it was not filed until the day of trial; whereas, Crim. R. 12(B)(5) and 12(C) require that requests for severance of charges or defendants shall be made within thirty-five days after arraignment or seven days before trial, whichever is earlier. Even though Crim. R. 12(G) provides that the failure to make objections or requests timely shall constitute a waiver thereof, the rule further provides that the court, for good cause "may grant relief from the waiver." We find the court did not abuse its discretion in refusing to grant relief from the waiver. See *State* v. *Jones* (1945), 145 Ohio St. 136. The case of *State* v. *Rosen* (1949), 151 Ohio St. 339, cited by appellant, is not controlling of the disposition of the issue herein; the facts therein are clearly distinguishable from the facts in the case *sub judice.* Furthermore, the record indicates that the trial court examined *in camera* the statements objected to, and sustained appellant's objection to the substantive use of the taped statements. The appellant did not take the stand and requested a jury instruction on self-defense; his co-defendant likewise asserted self-defense; the court charged on self-defense. The statement of co-defendant was used only on cross-examination and not in the prosecution's case in chief.

Assignment of Error No. 3 is stated thusly:

"The trial court erred in ruling that the prior statement of appellant could be used to impeach him at trial in breach of an agreement between defense counsel and the prosecutor."

By agreement between defense counsel and the Wood County Prosecutor, a taped interview or interrogation was conducted of the appellant herein and his co-defendant, Edward Villareal. We quote from a written memorandum by the trial court supplementing the trial court's oral ruling at trial allowing the state of Ohio the opportunity to use for impeachment purposes only a transcript of the taped interview:

"The issue is best framed through reference to the following statements of counsel prior to the taped interviews of Mr. Oviedo and Mr. Villareal, respectively:

" 'NELLER: Yeah, just uh, for the record, you know, we wanted complete open disclosure with the officers and we are consenting to this taped interview for purposes of this, for further discovery for presentation to the Grand Jury, uh, Miss Montgomery and I talked about it and she wanted to know more about the facts to make sure there wouldn't be a miscarriage of justice either way, you know, she wanted to make sure that she knew ac-

tually what happened and this tape can be, you know we're consenting the, to use the tape for purposes of discovery and uh, the Grand Jury situation, but not for trial purposes.

" 'MAYBERRY: O.K. Thank you. * * *

" 'NELLER: Oh, Betty I mentioned on the last uh, discussion, that you know, we're trying to cooperate the best we can and he's here voluntarily and he can make a taped statement for purpose of discovery and grand jury but I, I haven't consented that they be used during the trial. Course, I'm hoping that it doesn't go that far, but ah, you know I presented it to the grand jury.' "

As to the appellant Oviedo, this court adopts the reasoning of the trial court in permitting the use of the taped interview and finds the assignment of error with relation thereto not well-taken. Particular emphasis is placed upon the following excerpt from the trial court's memorandum:

"The reasoning of the United States Supreme Court in *Oregon* v. *Hass,* 420 U.S. 714 (1975), [*sic Haas*] and *Harris* v. *New York,* 401 U.S. 222 (1971), cases in which the Court held that confessions inadmissible in the prosecution's case-in-chief could be used for impeachment purposes, is apropos here. The Court said that the purpose of a trial is to search for truth. Thus, as long as the confession satisfied indicia of trustworthiness, even though it was obtained in violation of the Defendants' Fifth Amendment Rights it could still serve as a valuable aid in assessing the Defendants' credibility. The shield provided by exclusion should not be allowed to be perverted into a license to use perjury by way of defense, the Court said, free from the risk of confrontation with prior inconsistent utterances, 420 U.S. at 723-24; 401 U.S. at 225. The statements of the Defendants under the circumstances should not be protected to a greater extent than were the statements of *Haas* and *Harris*. The Defendants may not use the statements given for their own benefit to shield perjury. This was not the intent of the parties at the time the statements were taken."

It is noted that the appellant Oviedo did not take the stand and his interview was not used in any way at trial.

The appellant's fourth assignment of error is stated thusly:

"The trial court erred in allowing the use of Edward Villareal's confession for impeachment in breach of an agreement between defense counsel and the prosecutor to the grievous prejudice of appellant."

An examination of the record indicates that portions of the taped interview of co-defendant Edward Villareal implicated the appellant Oviedo. However, this court determines that no prejudicial error resulted therefrom for the reasons set forth in the disposition of Assignment of Error No. 3. Furthermore, the reference to appellant Oviedo in the taped transcript of co-defendant Villareal was only cumulative to the evidence adduced in the state's case-in-chief. There was no question about the appellant Oviedo's presence at the site of the crime nor any real question concerning his participation therein. Although appellant Oviedo did not take the witness stand, counsel on his behalf requested an instruction on self-defense. An examination of the entire record herein indicates that the theory of the defense was that appellant Oviedo was present, did participate in some of the activities on the evening involved, but his actions were in self-defense. Co-defendant Villareal was cross-examined by defense counsel; consequently, appellant's Sixth Amendment right of confrontation was not violated. Cf. *Bruton* v. *United States* (1968), 391 U.S. 123.

As a fifth assignment of error, the appellant contends that he was denied effective assistance of counsel as mandated by the Sixth Amendment to the United States Constitution. To support this assignment of error, the appellant argues

that his counsel rendered ineffective assistance by reason of his failure to enter into a binding agreement in regard to the taped statement referred to in Assignments of Error Nos. 2, 3 and 4, *supra*. In applying standards set forth in the cases cited below to be used in determining whether there has been a violation of a person's constitutional right to effective assistance of counsel, we find this assignment of error to be without merit. *State* v. *Wilkins* (1980), 64 Ohio St. 2d 382 [18 O.O.3d 528]; *State* v. *Lytle* (1976), 48 Ohio St. 2d 391 [2 O.O.3d 495].

The sixth assignment of error states that the trial court erred in denying appellant's motion for judgment of acquittal at the end of the state's case. An examination of the record indicates more than ample evidence in the state's case to require the cause to be submitted to the jury. *United States* v. *Williams* (C.A. 6, 1974), 503 F. 2d 50; *United States* v. *Shafer* (N.D. Ohio 1974), 384 F. Supp. 496; *State* v. *Bridgeman* (1978), 55 Ohio St. 2d 261 [9 O.O.3d 403].

Appellant's seventh assignment of error is:

"The verdict is against the manifest weight of the evidence."

Our examination of the record reveals more than ample evidence to sustain the verdict of the jury that the appellant was guilty beyond a reasonable doubt. See *State* v. *Eley* (1978), 56 Ohio St. 2d 169 [10 O.O.3d 340]; *Breese* v. *State* (1861), 12 Ohio St. 146.

Appellant's eighth assignment of error states the following:

"The trial court erred in refusing to instruct the jury on the lesser included offenses of voluntary and involuntary manslaughter."

Appellant here contends that the failure of the trial court to instruct on the lesser included offenses of voluntary and involuntary manslaughter constitutes prejudicial error. R.C. 2903.03 provides, in part:

"No person while under extreme emotional distress brought on by serious provocation reasonably sufficient to incite him into using deadly force shall knowingly cause the death of another."

Under Ohio law, in a prosecution for aggravated murder or murder, instructions on the lesser included offenses of voluntary and involuntary manslaughter must be submitted to the jury only if the defendant produces or elicits some evidence of the mitigating circumstances. *State* v. *Muscatello* (1978), 55 Ohio St. 2d 201 [9 O.O.3d 148]. Where, however, the defendant fails to elicit any evidence of the mitigating circumstances, jury instructions on the lesser included offenses are clearly erroneous. *State* v. *Durkin* (1981), 66 Ohio St. 2d 158 [20 O.O.3d 168].

Extreme emotional stress is not an element of the crime of voluntary manslaughter but, rather, it is a circumstance which mitigates a defendant's criminal culpability. *State* v. *Durkin*, *supra*, at 160. An act committed while under extreme emotional stress is one performed under the influence of sudden passion or in the heat of blood, without time and opportunity for reflection or for passions to cool. The emotional stress or condition must be extreme, great in nature or intensity, and the stress must be brought on by serious provocation. *State* v. *Muscatello*, *supra*, at 206.

In the instant case, appellant contends that he participated in the murder only under extreme emotional stress brought on by serious provocation, the provocation consisting of an alleged headlock that Steve Bowers put on the appellant during the fight. However, Mr. Snyder testified as follows:

"A. I don't think anyone was in a headlock. They were holding him.

"Q. Okay. Was he ever in a headlock?

"A. No."

Similarly, Roger Puett testified as follows:

"Q. Okay. Did you observe any headlocks by anybody?

"* * *

"A. No, I didn't see anyone with an arm around a head."

Furthermore, the evidence demonstrates that the appellant jumped on the back of the manager without provocation after the manager went outside to aid Steven Bowers. The manager, Rich Kohler, testified as follows:

"Q. All right. What did you do after that?

"A. At that point I got jumped from behind.

"Q. By who? [sic.]

"A. By this kid on the left here.

"Q. Jimmy Oviedo?

"A. Yes. I flipped him over and ran towards the door."

In State v. Durkin, supra, where the defendant was arrested for shooting a black youth in a bar, the court held that the defendant was not entitled to a jury instruction on the offense of voluntary manslaughter because he failed to elicit any evidence of the mitigating circumstance of extreme emotional stress. Although the defendant produced testimony relating to his marital problems, his alcoholism, and the fact that his uncle had been robbed, raped and murdered by five black youths eleven days prior to the incident, the court concluded that such facts, "while unfortunate, are not the type of mitigating circumstances that give rise to a claim of extreme emotional stress." Durkin, supra, at 162.

In a similar manner, the alleged headlock and attending events in the instant case were also insufficient to establish serious provocation and a claim of extreme emotional stress. The court, therefore, finds no error in the trial court's failure to give the requested jury instructions, and appellant's eighth assignment of error is found not well-taken.

The ninth assignment of error asserts that the trial court erred in overruling appellant's motion for a change of venue because of prejudicial publicity. The last of the published articles concerning the crime herein appeared five months prior to trial. Upon considering the nature, extent and timing of the publicity and the extensive voir dire examination of the jurors, we find this assignment of error not well-taken. State v. Bayless (1976), 48 Ohio St. 2d 73 [2 O.O.3d 249]; State v. Swiger (1966), 5 Ohio St. 2d 151 [34 O.O.2d 270].

Finally, the appellant asserts as an assignment of error that on the record as a whole, appellant was not given a fair trial in violation of the Fifth Amendment to the Constitution of the United States and was deprived of liberty without due process of law. Our examination of the record reveals that the appellant herein was given a fair trial. If any errors were committed, such errors were not prejudicial. In this regard it is an accepted principle that a person accused of a crime is entitled to a fair trial, but that does not mean he is entitled to a perfect trial. State v. Dickerson (1907), 77 Ohio St. 34; State v. Davis (1975), 44 Ohio App. 2d 335 [73 O.O.2d 395].

On consideration whereof, the court finds that the defendant was not prejudiced or prevented from having a fair trial, and judgment of the Wood County Common Pleas Court is affirmed. This cause is remanded to said court for execution of sentence and for costs. Costs assessed against appellant.

*Judgment affirmed.*

POTTER, J., concurs.

BARBER, J., dissents.

WILEY, J., retired, of the Sixth Appellate District, was assigned to active duty under authority of Section 6(C), Article IV, Constitution.

POTTER, J., concurring. Relative to Assignment of Error No. 1 and Juv. R. 30 requirements, I concur in the majority

decision and opinion for the reasons therein stated and for the reasons stated in my dissent in *State* v. *Reuss* (Aug. 7, 1981), Wood App. No. WD-81-26, unreported. Since the decisions in *State* v. *Oviedo* and *Reuss, supra,* in my opinion, reach opposite conclusions relative to Juv. R. 30 requirements, I would convene this court *en banc* to resolve the conflict and formulate one uniform rule for the guidance of the bench and bar in the Sixth Appellate District. See, *e.g.*, Federal Rules, United States Court of Appeals for the Sixth Circuit, Rule 14, "En Banc-Required Statement for Rehearing En Banc," and Fed. R. App. P. 35.

BARBER, J., dissenting. I respectfully dissent from the majority opinion as it relates to the first assignment of error. I find the order of transfer of the Wood County Juvenile Court under Juv. R. 30 identical to that issued by the same court which was reviewed by this court in *State* v. *Reuss* (Aug. 7, 1981), Wood App. No. WD-81-26, unreported. The majority opinion in *State* v. *Reuss, supra,* found the Juv. R. 30 transfer proceedings defective for failure to comply with the mandate of Juv. R. 30(G) and, therefore, the Wood County Court of Common Pleas lacked jurisdiction over this matter.

*Kent* v. *United States* (1966), 383 U.S. 541 [40 O.O.2d 270], and its reaffirmation in *In re Gault* (1967), 387 U.S. 1 [40 O.O.2d 378], clearly sets forth that the principles of fundamental fairness and due process of law are mandated in juvenile proceedings. *Kent* specifically recognized that the transfer of jurisdiction from the juvenile court for prosecution as an adult is a "critically important" stage which determines vitally important statutory rights of the juvenile. The court in *Kent* held:

"'* * * as a condition to a valid waiver order, petitioner was entitled to * * * a statement of reasons for the Juvenile Court's decision." *Id.* at 557.

This requirement for a statement of reasons accompanying or embodied in the transfer order is based upon a need for information upon which a higher court can conduct a meaningful review and will, therefore, serve as a protection against an arbitrary or capricious order of transfer.

"Meaningful review requires that the reviewing court should review. It should not be remitted to assumptions. It must have before it a statement of reasons motivating the waiver, including, of course, a statement of the relevant facts." *Id.* at 561.

The constitutional principle set forth in *Kent* and *Gault,* has been incorporated into Ohio's juvenile proceedings through Juv. R. 30. Paragraph G of Rule 30 unequivocally provides, "The order of transfer shall state the reasons therefor." This in effect mandates the court to make findings of fact.

In the case *sub judice,* a careful reading of the juvenile court's order of transfer is devoid of specifying any reasons for the transfer other than the ultimate conclusory reason of non-amenability to treatment and community safety. True, the court sets forth that consideration was given to the criteria of Juv. R. 30(E)(1) through (5) which are to guide the court in determining the juvenile's amenability to treatment and community safety. The order of transfer should not merely repeat language of the statute, but should specify what the court found, good or bad, about the juvenile's mental and physical health; his juvenile record; past efforts to rehabilitate; his family environment; and his school record. The court should then correlate these findings into reasons for the transfer order. Only then can there be a meaningful review and determination made whether there are substantial reasons sufficient to support the order of transfer of jurisdiction. Otherwise, it becomes merely a *pro forma* order and the reviewing court can merely guess or assume what basis the juvenile court used to order the transfer. This, in effect, requires, the reviewing court to

review the entire record in search for reasons and then substitute its judgment for that of the lower court.

I would, therefore, find the transfer was not in substantial compliance with Juv. R. 30, and further find appellant's first assignment of error well-taken.