**In re SNITZKY.\***

Court of Common Pleas of Ohio,
Cuyahoga County,
Juvenile Division.

No. 9501029.

Decided Aug. 1, 1995.

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, and *Edward FitzGerald,* Assistant Prosecuting Attorney, for the state.

*Jack Delaney,* for the child.

KENNETH A. ROCCO, Judge.

## I. *FACTS*

On December 18, 1994, fourteen-year-old Megan Norman was reported missing by her mother. A month later, William Gast led police to her shallow grave.

---

\* No appeal has been taken from the decision of the court.

According to a statement he gave to the police, William knew the location of the grave because he had helped her murderer bury her body. When Megan's body was unearthed, it was determined that she had been strangled with a shoelace.

On March 8, a hearing was held to determine if there was probable cause to believe that Wayne Snitzky had murdered Megan. This court heard testimony concerning the statement given to police by Wayne's friend William. Evidence was also presented linking fibers found on Megan's clothing to the carpeting in the van in which Wayne told William he had hidden Megan's body after her murder. Additionally, a shovel found in the same van had dirt on it consistent with the dirt from Megan's grave site. Based on this evidence, this court determined that there was probable cause to believe that Wayne had committed the murder.

On April 11, a second hearing was held to determine first, if Wayne was amenable to rehabilitation, and second, if the safety of the community required that he be placed under legal restraint for a period extending beyond the age of his majority. According to psychological reports stipulated to by both parties, this is Wayne's first appearance before juvenile court; consequently, there have been no previous attempts at rehabilitation. Wayne was almost eighteen at the time of the offense, and there was no evidence presented that he suffered from any mental or physical disability. He has achieved above-average to superior grades throughout his educational experience. Wayne has worked steadily since junior high school and contributed to his education expenses. Wayne's family is intact, stable, and supportive of him.[1]

At the April 11 hearing, the state again presented testimony concerning statements given to the police by William Gast. A detective testified that Wayne had considered various "candidates" for the role of victim in his murderous plans since October 1994 and had finally settled on Megan Norman after rejecting several other potential victims.

The only factors listed by the Juvenile Court Diagnostic Clinic psychologist as indicators that Wayne would not be amenable to rehabilitation were his age and, of course, the violent nature of the offense with which he has been charged.

---

1. The psychological reports presented to this court state that Wayne's parents considered their family to be a group of adults living together. In terms of the child's amenability to rehabilitation, this court believes that the child's family life should be considered as a factor in favor of retaining jurisdiction when the court is presented with evidence that a strong parent-child relationship exists. To this court, a strong parent-child relationship means that the child is accountable to his parents and is subject to their influence. Therefore, Wayne's relationship with his family does not weigh as heavily in favor of retaining jurisdiction as it would if he was unemancipated and still under the substantial control of his parents.

54

## II.  DISCUSSION

### A.  Introduction

As is clear from the extensive media coverage of such crimes, violent offenses committed by juveniles are considered to be one of today's most intractable problems.  In a recent USA Today/CNN/Gallup poll, seventy-three percent of respondents said that "violent juveniles should be treated as adults rather than as defendants in lenient juvenile courts," and that juvenile courts are "wholly out of touch with reality."[2]

As a society, we have not yet developed a response to such crimes which adequately balances the juvenile court's historical purpose of rehabilitation with the public's understandable need for retribution in instances of particularly heinous crimes committed by juveniles.  The eventual solution to juvenile crime will only be forged in a continuing dialogue between the court, the legislature, and the people of Ohio.

Unfortunately, Ohio law regarding the transfer of juvenile offenders to the general division for prosecution as an adult is confused and contradictory.  The proper weight which should be given to the degree of violence of the offense, versus the youth's prospects for rehabilitation, is unclear, with the rule, statute, and case law offering contradictory directives.

In order to make the necessary public discourse possible, a court must honestly state the reasons for its decision, rather than camouflaging its rationale in the nonsensical intricacies of the statute, rule, and precedents.  When a court choses to camouflage the reasons for a particular decision, it short-circuits the democratic process.  In order for this process to function effectively, a juvenile court must honestly and openly articulate the rationale behind its decision whether or not to transfer a youth.  Additionally, in order to meet constitutionally mandated due process requirements, a reviewing court must be able to meaningfully review such a decision.

One effect of the lack of direction offered by the statute, rule, and precedents is transfer decisions which are subjected to only a cursory review, as any conclusion can be read to fit within the broad applicable law.  In effect, the discretion of the juvenile court is largely unfettered.  Beyond the obvious due process concerns, decisions made in such a vacuum contribute little to the evolution of juvenile justice because they hinder the ongoing dialogue between the courts and the

---

2.  USA Today/CNN/Gallop Poll October 1993, Sam Vincent Meddis, Poll: Treat Juvenile the Same as Adult Offenders, USA Today, Oct. 29, 1993, at 1A, in Francis B. McCarthy, The Serious Offender and Juvenile Court Reform: The Case for Prosecutorial Waiver of Juvenile Court Jurisdiction (1994), 38 St. Louis Univ.L.J. 629.

legislature, which is an absolute necessity in crafting solutions to the ever-increasing problem of gang- and drug-related violent crimes.

Before directly addressing the current shortcomings of Ohio law, a brief overview of the problem is necessary to emphasize the importance of the decision to transfer a youth for prosecution as an adult, and the tension between the ideals of rehabilitation and retribution.

## B. *Transfer of Juveniles In Response to Society's Demands For a Legitimate Reaction to Violent Crimes*

Although a preliminary matter, the juvenile court's decision to waive its exclusive jurisdiction over the child and transfer the child for prosecution as an adult should be considered of the utmost importance.

"[W]aiver itself is a severe sanction, with potentially harsh consequences, including extended detention in jail, a protracted adjudicatory process, a felony conviction resulting in social and legal sanctions, and a lengthy sentence at a secure correctional institution.  * * * It does more than determine a judicial forum for the accused youth.  It invokes a jurisprudential philosophy that governs the nature of the proceedings as well as the purpose and severity of the sanctions."[3]

Traditionally, one of the primary purposes of juvenile courts has been to rehabilitate youthful offenders.[4]  The concept of rehabilitation is based on an understanding that future crime can be reduced by changing the behavior patterns of individual offenders and does not necessarily require an extended period of incarceration.[5]  This contrasts with the primary purpose of adult criminal proceedings, which is to fix culpability and exact retribution as much as it is to rehabilitate the offender.

Most states have had some sort of transfer mechanism in place since the inception of distinct juvenile courts in the early Twentieth Century.[6]  The transfer of youthful offenders from juvenile courts to criminal courts recognizes that the historical purpose of juvenile courts renders them unable to impose the severe penalties society demands for heinous offenses.  As the number and

---

3.  Martin L. Forst & Martha–Elin Blomquist, Cracking Down on Juveniles: The Changing Ideology of Youth Corrections (1991), 5 Notre Dame J.L., Ethics & Pub.Policy 323, 339.

4.  See, generally, Symposium on Serious Juvenile Crime (1991), 5 Notre Dame J.L., Ethics, & Pub.Policy 257 (1991).

5.  See Anne R. Mahoney, "Man, I'm already dead": Serious Juvenile Offenders in Context (1991), 5 Notre Dame J.L., Ethics, & Pub.Policy 443, 453–454, in John J. Cloherty III, The Serious Juvenile Offender in the Adult Criminal System (1992), 26 Suffolk U.L.Rev. 407.

6.  See fn. 1, Frost & Blomquist at 338.

degree of violent crimes committed by juveniles increases, society has begun to focus less on the prospect of rehabilitating the young offender and more on the understandable desire to punish the offender.[7]

Although the trend towards retribution has certainly been gaining momentum since the surge of violent gang- and drug-related crimes, some courts have been explicitly addressing this issue for more than a decade. For example, in 1979, the Washington Supreme Court stated that punishment can be a form of rehabilitation. The court reasoned that "accountability for criminal behavior * * * does as much to rehabilitate * * * an errant youth as does the prior philosophy of focusing upon the * * * characteristics of the individual juvenile." *State v. Lawley* (1979), 91 Wash.2d 654, 656–657, 591 P.2d 772, 773. Similarly, in 1983, the Nevada Supreme Court reasoned that "[b]y formally recognizing the legitimacy of punitive and deterrent sanctions for criminal offenses juvenile courts will be properly and somewhat belatedly expressing society's firm disapproval of juvenile crime and will be clearly issuing a threat of punishment for criminal acts to the juvenile population." *In re Seven Minors* (1983), 99 Nev. 427, 432, 664 P.2d 947, 950.

Ultimately, the question of how to respond to violent juvenile crime is one of the most important issues facing our society. It is not just the youth who benefits from remaining in juvenile court. The juvenile offender who is committed to an adult penal institution is likely to emerge with few skills and little education, and no experience in living a responsible, law-abiding life. Indeed, such a youth is likely to return to society a more proficient criminal. In 1972, Judge Wright of the District of Columbia Circuit Court eloquently stated the importance of carefully and purposefully adopting an approach to deal with juvenile crime:

"There is no denying the fact that we cannot write these children off forever. Some day they will grow up and at some point they will have to be freed from incarceration. We will inevitably hear from [these children] again, and the kind of society we have in the years to come will in no small measure depend on our treatment of them now." *United States v. Bland* (D.C.Cir.1972), 472 F.2d 1329, 1349 (Wright, J., dissenting).

### C. *Due Process Concerns in Transfer Decisions*

The importance of the decision to prosecute a juvenile as an adult has long been recognized by the Supreme Court of the United States. In its most influential decision concerning this issue, *Kent v. United States* (1966), 383 U.S.

---

7. Dan Macallair, Reaffirming Rehabilitation in Juvenile Justice (1993), 25 Youth & Society 104.

541, 86 S.Ct. 1045, 16 L.Ed.2d 84, the Supreme Court discussed the process constitutionally required when a juvenile court considers waiving its jurisdiction over a youthful offender. In *Kent*, a juvenile was transferred without any notice to his parents or counsel, and without any hearing, although the judge claimed in his order that the decision was made after a "full" investigation. In reversing the youth's conviction, the court stated that the order transferring the youth to criminal court should be sufficiently specific to allow an appellate court to review and understand the reasons for the determination: "Meaningful review requires that the reviewing court should review." *Kent* at 561, 86 S.Ct. at 1057, 16 L.Ed.2d at 97. The court also noted that while the juvenile court judge has considerable discretion, the judge must not have complete latitude in reaching his or her decision.

The most important point of the *Kent* decision is that the discretion vested in the juvenile court is not a license to be arbitrary. "There is no place in our system of law for reaching a result of such tremendous consequence without ceremony—without hearing, without effective assistance of counsel, *without a statement of reasons*." (Emphasis added.) *Kent* at 554, 86 S.Ct. at 1053–1054, 16 L.Ed.2d at 93. Although the court is clear that a formal statement of findings is not required, it does conclude that "the statement should be sufficient to demonstrate that the statutory requirement[s] * * * ha[ve] been met; and that the question has received the careful consideration of Juvenile Court; and it must set forth the basis for the order with sufficient specificity to permit meaningful review." *Kent* at 561, 86 S.Ct. at 1057, 16 L.Ed.2d at 97.

As juvenile courts begin to take a more punitive stance, the importance of the due process requirements dramatically increases. As noted by Chief Justice Cavanagh in *People v. Hana* (1993), 443 Mich. 202, 228, 504 N.W.2d 166, 179: "In reality, the decision to waive juvenile court jurisdiction is not a decision to *rehabilitate*, but, rather, a decision to *punish* the juvenile upon conviction. Thus, the juvenile should be afforded the traditional due process protections in judicial waiver proceedings enjoyed by adults accused of crime." (Emphasis *sic*.) (Cavanagh, C.J., dissenting.)

As long as society's demand for an appropriate response in instances where juveniles commit extremely violent crimes is explicitly addressed, such determinations meet the constitutional requirements of due process. In *Deel v. Jago* (C.A.6, 1992), 967 F.2d 1079, the Sixth Circuit Court of Appeals considered an Ohio juvenile court's decision to transfer a juvenile that was based on retribution and deterrence, rather than a finding that the juvenile was beyond rehabilitation. After examining the record which was before the trial court, and its opinion, the Sixth Circuit determined that the juvenile court relinquished jurisdiction over the youth "on the basis of retribution and deterrence, not rehabilitation." *Deel* at

1090. The court concluded that the court's transfer decision did not "run afoul of the Constitution." *Id.*

Beyond the constitutional protections afforded defendants, the due process requirements identified in *Kent* also contribute to the evolution of the law. The proscription against arbitrary and capricious decisions forces the court to conform to the law as enacted by the legislature, and decisions issued in conformity with statutes and precedence offer the legislature the opportunity to refine, or perhaps reformulate, its solutions to various problems. An offender who commits a crime as violent and premeditated as the one allegedly committed by Wayne Snitzky may in fact be amenable to rehabilitation. Whether or not society chooses to spend its limited resources rehabilitating such an offender is another question, which should be directly considered, rather than ignored.

Of course, this court is not suggesting that any determination made during a transfer decision is as simple as the statutory structure implies. However, decisions that are based primarily on the concern for punishment in response to a violent crime, but do not state that this is the case, instead couching the decision in the tangles of the statute, rule, and law, do a disservice to the juvenile justice system for two reasons. First, the unarticulated motivation of retribution violates the juvenile offender's due process rights. Given the trend towards retribution and deterrence, rather than rehabilitation, this should be a primary concern. Second, such a cursory approach to the determination to transfer may be read as a conclusion that the juvenile court system *cannot* treat the young offender, rather than a determination that the court does not wish to allot any more of the community's limited resources to treating the child. The current public perception is that the juvenile court is failing to accomplish its purpose, and some commentators have even suggested that it be abolished.[8] An honest admission that the crime the juvenile has allegedly committed is so heinous that society demands more retribution than can be exacted within the framework of the juvenile justice system will benefit the evolution of juvenile law by allowing meaningful review by appellate courts, by allowing the legislature to respond to the important policy issues which arise in juvenile court, and by increasing the public's respect for the integrity of the juvenile court.

D. *The Decision to Transfer a Juvenile to the General Division for Prosecution as an Adult Under Ohio Law*

Ohio law permits a juvenile court to waive its exclusive jurisdiction over a youthful offender if the child is fifteen or older. The result of this waiver is the

---

8. See, *e.g.*, Richard O. Dawson, The Future of Juvenile Justice: Is it Time to Abolish the System? (1990), 81 J.L. & Crim. 136 (The author concludes that the primary reason in favor of maintaining the distinction between juvenile courts and adult criminal courts is the increased funding juvenile courts attract because they are dedicated to children.).

transfer of the juvenile to the general division for prosecution as an adult. Transfer proceedings are governed by both R.C. 2151.26 and Juv.R. 30. The statute provides the structure of the decision, and the rule lists the factors to be considered in making the requisite determinations. The court must first determine that there is probable cause to believe that the child committed the act alleged and that the act would constitute a felony if the offender were an adult. If there is probable cause, the case is continued for a "full investigation" to determine if jurisdiction over the child should be transferred to the general division.

At a subsequent hearing, the juvenile court must also find "reasonable grounds" to believe that the child is not amenable to treatment. In *State v. Carmichael* (1973), 35 Ohio St.2d 1, 64 O.O.2d 1, 298 N.E.2d 568, the Ohio Supreme Court stated that the investigation is not required to show that the child cannot be rehabilitated as a juvenile, only that there are reasonable grounds to believe that he cannot be rehabilitated. Finally, the court must also determine whether the safety of the public requires the legal restraint of the child beyond the age of his majority.

According to the legislative enactments, the court is required to "state" the reasons for the decision to transfer. However, the Ohio Supreme Court has decided that the court is not required to make written findings of the enumerated factors. "Although the better practice would be to address each factor, as long as sufficient, credible evidence pertaining to each factor exists in the record before the court, the bind-over order should not be reversed in the absence of an abuse of discretion." *State v. Douglas* (1985), 20 Ohio St.3d 34, 36, 20 OBR 282, 284, 485 N.E.2d 711, 712.

In its most recent decision relating to the transfer of juveniles to the general division, *State v. Watson* (1989), 47 Ohio St.3d 93, 547 N.E.2d 1181, the Supreme Court of Ohio affirmed a juvenile court's decision to transfer a child, even though the judge's decision significantly departed from the statutory requirements. The juvenile court judge found that the child "would not be amenable to the juvenile justice system for the reason that the safety of the community may require his retention beyond the age of majority." *Watson* at 94, 547 N.E.2d at 1183. The result of the juvenile court judge's decision in *Watson* was to collapse the two-part decision into one determination, completely undermining the integrity of the legislature's enactment. The court validated the juvenile judge's exercise of discretion and said that transfer decisions would be reversed only when there had been an abuse of discretion. This court wonders when such an abuse could possibly occur. In view of *Watson,* the juvenile court's discretion in Ohio appears to be unfettered, as there is no requirement that the juvenile court make its determination within the prescribed statutory confines.

In affirming the juvenile court's decision, the Ohio Supreme Court also stated that there was no requirement that each, or any, of the factors listed be resolved against the juvenile, so long as the totality of the evidence supports a finding that the juvenile is not amenable to treatment. *Watson* at 95, 547 N.E.2d at 1183–1184, *citing State v. Oviedo* (1982), 5 Ohio App.3d 168, 5 OBR 351, 450 N.E.2d 700. While this direction may be logically feasible, it provides little guidance in making the decision whether or not transfer the juvenile.

The *Watson* decision clearly disregards the approach mandated by the United States Supreme Court and the Ohio legislature, creates precedent which provides no guidance for juvenile court judges, and short circuits the evolution of this most important area of juvenile law. Unfortunately, it has been this court's experience that *Watson* is a case often cited by the state in support of its motion to transfer.

The Ohio Supreme Court's decision in *Watson* is not the only confusing direction given to juvenile court judges in making the determination whether or not to transfer a child. For example, R.C. 2151.26(B) specifically directs the court to consider the violence of the crime as a factor in favor of transfer, but adds that it "shall not control the decision of the court." How it is to be weighed in the decision whether or not to transfer is unclear, as the statute does not even state which of the two determinations the court must make, concerning amenability to rehabilitation or the public's safety, it is relevant to.

Additionally, in response to *Watson,* Ohio law governing the transfer of juveniles to the general division for prosecution as an adult was significantly amended in 1994. Juv.R. 30 now specifically directs the juvenile court to consider the nature of the offense for which transfer is considered. However, the facts relating to the offense are to be considered only to the extent relevant to the child's physical or mental condition, and the Staff Notes warn of the prejudice that a particularly heinous crime could cause the court. Once again, juvenile courts are faced with little direction in the application of this new factor. It is this court's contention that the distinction between consideration of the facts of the crime as relevant only to the child's mental and physical condition, rather than as relevant to the concern for a legitimate response to the violent crime the child has committed, is not necessary and is impossible to implement.

To further obscure the proper balancing of retributive and rehabilitative concerns, the directive of R.C. 2151.26(B) and Juv.R. 30 are contradictory. R.C. 2151.26(B) specifically directs the court to consider the violent nature of the crime, and even directs the court to consider the victim. Obviously, this goes beyond the consideration directed in the rule, which states that the nature of the crime is only to be considered to the extent that it reflects on the child's mental or physical health.

The most instructive opinion on this issue was written by a Minnesota appellate court. In *In re Welfare of D.F.B.* (1988), 430 N.W.2d 475, the Minnesota Court of Appeals reversed a juvenile court judge's decision not to transfer a youth who was accused of murdering four family members. The appellate court stated that the child, "D.F.B.," should have been transferred by the juvenile court, even though he had been found amenable to rehabilitation, because society demands transfer due to the seriousness of the crimes he was alleged to have committed. The juvenile court judge expressed his dismay over the conclusion in favor of rehabilitation, which he felt he was forced to make because of the approach mandated by statute in Minnesota. The court of appeals reversed the judge's decision and explicitly articulated its rationale as being based on punitive, rather than rehabilitative, concerns. The court stated that a punitive approach promoted the public's safety and reduced juvenile delinquency by maintaining the integrity of the substantive law. Further, the punitive approach worked to develop individual responsibility for lawful behavior. The court held that although there was not enough evidence that the child could not be rehabilitated, he should still be transferred, based on society's legitimate need to see him punished for the heinous crime he had committed:

"We are convinced that the legislature intended the language of Section 260.011 to ensure that the criminal justice system would not be permitted to provide an excessively minimal response to an offense which had a major impact upon society. * * * Retention of the alleged murderer within the criminal justice system for less than three years would constitute an excessively minimal response.

"We conclude that the legislature intended to protect the strong and legitimate interest of the public in a fair response by the criminal justice system to a heinous crime. There can be no doubt that the offenses here are heinous and that the only fair response of the criminal justice system, as a matter of law, under the facts of this case, overcomes any consideration, however weighty, given by the trial court to the absence of anti-social or violent behavior in D.F.B.'s past."

"[I]t is clear as a matter of law that D.F.B. must be referred for adult prosecution." [9] *D.F.B.*, 430 N.W.2d at 482–483.

This court commends the Minnesota Court of Appeals for its honest approach to the ever-increasing levels of serious, violent crime committed by juveniles.

9. Interestingly, the Supreme Court of Minnesota held that the justification offered by the court of appeals was inappropriate. It affirmed the reversal of the trial court's decision, but wrote an opinion to specifically refute the rationale given by the court of appeals. The Supreme Court stated that the evidence before the trial court had actually been sufficient to support a transfer of the youth because he was not amenable to rehabilitation. *In re Welfare of D.F.B.* (1988), 433 N.W.2d 79.

In thirteen years this judge has never before seen the state request transfer of a child when the child had not been a prior offender—unless the child was charged with committing an extremely serious and violent crime. The nature of the offense is obviously the primary consideration of the state in its decision whether or not to seek transfer; to mandate then that the court limit its consideration of the heinousness of the crime, as directed in Juv.R. 30(F)(6), is an attempt to close the barn door after the cows have already left. In fact, legislation is currently under consideration by the Ohio General Assembly which would make transfer mandatory for juveniles who have committed certain offenses, ending all consideration of the juvenile's prospects for rehabilitation.

## III. CONCLUSION

The problem of juveniles who commit violent crimes will inevitably arise with more and more frequency as gang- and drug-related crimes continue to surge. Juvenile courts need to be responsible for providing reviewing courts with adequate statements of their findings and articulated and honest rationales for their decision to transfer the juvenile for prosecution as an adult. Doing so will allow our justice system to purposefully and intelligently choose the approach it wishes to take in response to violent crime by juveniles.

In this case, as was the case in *Watson,* the child comes before the court without a prior juvenile record and without prior efforts at rehabilitation. Other than the fact that Wayne was nearly eighteen when he allegedly committed the crime, and the violent nature of the offense, this court is unable to clearly resolve any of the factors listed in the rule against the child's amenability to rehabilitation, because of the child's relatively uneventful social history prior to the present murder charge. Even though only factors (1) and (6) weigh against the child's amenability, it is crystal clear to this court that this child should be transferred to the general division for prosecution as an adult, primarily because of the heinous nature of the crime. Additionally, it is also crystal clear to this court that the safety of the public may require the legal restraint of the child beyond the age of majority. This court cannot conceive of anybody more dangerous to the public's safety than a predator who coldly considers possible "candidates" for victim of his crime.

In conclusion, although in this case there exists sufficient evidence related to Juv.R. 30(F)(1) and (6) on which to predicate a finding of unamenability, the state sought transfer, and Wayne Snitzky will be transferred to the general division for prosecution as an adult, primarily because of the nature of the offense he allegedly committed. This court hopes to further the dialogue about solutions to violent juvenile crimes by openly articulating the motivations for its decision, rather than hiding behind the confusion of Ohio juvenile law. A child who

committed a violent murder has removed himself from the realm of childhood, and society rightfully demands more retribution than that which can be exacted in juvenile court. This opinion is issued in conjunction with a journal entry granting the state's motion for transfer, which conforms with both R.C. 2151.26 and Juv.R. 30.[10]

*Judgment accordingly.*

## APPENDIX

At the March 2, 1995 preliminary hearing on the state's motion to transfer, the court determined that:

a. Wayne Snitzky was a child of 17 years at the time of the offenses alleged in the complaint;

b. The acts alleged in the complaint would be felonious acts if committed by an adult; and

c. There is probable cause to believe that Wayne Snitzky committed the acts alleged in the complaint.

According to Section 2151.26(A)(1)(c) and Juvenile Rule 30(C), the court may relinquish jurisdiction and transfer the case of Wayne Snitzky if there are reasonable grounds to believe that:

"(i) he is not amenable to care or rehabilitation or further care or rehabilitation in any facility designed for the care, supervision, and rehabilitation of delinquent children;

"(ii) the safety of the community may require that he be placed under legal restraint for the period extending beyond his majority."

In determining the amenability to juvenile treatment or rehabilitation, Juvenile Rule 30(F) requires the court to consider seven factors:

(1) the child's age and the child's mental and physical health;

(2) the child's prior juvenile record;

(3) efforts previously made to treat or rehabilitate the child;

(4) the child's family environment;

(5) school record; and

(6) the specific facts relating to the offense for which probable cause was found, to the extent relevant to the child's physical or mental condition.

The court determines that there are reasonable grounds to believe that:

---

10. See Appendix.

(1) Wayne Snitzky is not amenable to care or rehabilitation or further care or rehabilitation in any facility designed for the care, supervision, and rehabilitation of delinquent children, and

(2) The safety of the community may require that Wayne Snitzky be placed under legal restraint for a period extending beyond his majority.[a]

On April 26, 1995, the court, upon due consideration, grants the motion to transfer jurisdiction of the case of Wayne Snitzky to the General Division of Cuyahoga County Common Pleas Court for criminal prosecution of the case. It is therefore ordered, adjudged and decreed that pursuant to Juvenile Rule 30 and Section 2151.26, the matter herein is transferred to the General Division of the Cuyahoga County Common Pleas Court for further proceedings pursuant to law. It is further ordered, pursuant to Section 2151.312, that the child herein is remanded to the county jail for detention in accordance with the law governing the detention of persons charged with crime.

It is further ordered that Wayne Snitzky may be released pending trial upon entering into a recognizance bond with good and sufficient surety in the sum of $500,000 for his appearance before the court of common pleas, general division, at such time as may be fixed by that court.

---

a. See formal decision for a discussion of the court's findings.