OPINION *Page 2 
{¶ 1} Defendant-appellant Justin Lucas appeals his conviction in the Stark County Court of Common Pleas. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On July 10, 2006, Tona Delong left work and picked up Appellant at his place of employment. Together they drove and picked up Jacob Rollins. Delong was involved sexually with Appellant, Rollins and Jason Halter. The three drove around the neighborhood of Jason Halter a few times, and Delong text messaged Halter to invite him to meet her. Appellant and Rollins used Delong's invitation to intercept Halter in order to rob him.
 {¶ 3} Appellant brandished a firearm he obtained from Rollins, and waited for Halter in an alley where a vehicle was parked Appellant believed Halter would use. Appellant subsequently shot Halter. An autopsy later revealed Halter was shot three times, and the gun was held 18-24 inches from Halter.
 {¶ 4} On August 23, 2006, the Stark County Grand Jury indicted Appellant on one count of aggravated murder, in violation of R.C. 2903.01(B); and one count of aggravated robbery, in violation of R.C. 2911.01(A)(1), with a death penalty specification stating Appellant was the principal offender. The charges stemmed from the shooting death of Jason Halter on July 10, 2006.
 {¶ 5} Appellant entered a plea of not guilty to the charges, and the matter proceeded to jury trial on September 10, 2007. The jury returned a verdict of guilty on the charges, including a finding Appellant was the principal offender in the aggravated murder. *Page 3 
 {¶ 6} Following the mitigation stage of the trial, the jury recommended a sentence of life in prison, without parole eligibility for thirty years. The trial court then sentenced Appellant to life imprisonment without parole eligibility for thirty years on the murder charge, five years in prison on the aggravated robbery conviction and an additional three years on the firearm specification, for a total minimum of 38 years.
 {¶ 7} Appellant now appeals, assigning as error:
 {¶ 8} "I. THE TRIAL COURT'S FINDING OF GUILT IS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.
 {¶ 9} "II. THE APPELLANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND OF ASSISTANCE OF COUNSEL BECAUSE HIS TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE.
 {¶ 10} "III. THE APPELLANT WAS DEPRIVED OF DUE PROCESS OF LAW BY THE MISCONDUCT OF THE PROSECUTOR."
 {¶ 11} Appellant assigns as supplemental error:
 {¶ 12} "IV. THE APPELLANT WAS DEPRIVED OF DUE PROCESS OF LAW BY THE STRUCTURAL DEFECT CONTAINED IN THE INDICTMENT WHEREIN AN ESSENTIAL ELEMENT OF THE OFFENSE WAS OMITTED AND THAT DEFECT WAS NOT CURRED [SIC] BY NOTIFICATION OF THE ELEMENT OF RECKLESSNESS TO THE CHARGE OF ROBBERY FROM EITHER THE PROSECUTOR OR THE COURT."
 I. {¶ 13} In the first assignment of error, Appellant argues his conviction for aggravated murder with a firearm specification was against the manifest weight and sufficiency of the evidence. Specifically, Appellant claims the State failed to *Page 4 
demonstrate evidence of "purpose," a necessary element of the crime. Rather, Appellant claims he successfully demonstrated he only shot Halter when Halter lunged at him.
 {¶ 14} In State v. Jenks (1981), 61 Ohio St.3d 259, 574 N.E.2d 492, superseded by constitutional amendment on other grounds in State v.Smith, 80 Ohio St.3d 89, 1997-Ohio-355, 684 N.E.2d 668, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."Id. at paragraph two of the syllabus.
 {¶ 15} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." State v. Thompkins, 78 Ohio St.3d 380,387, 1997-Ohio-52, 678 N .E.2d 541 superseded by constitutional amendment on other grounds as stated by State v. Smith,80 Ohio St.3d 89, 1997-Ohio-355, 684 N .E.2d 668, citing State v. Martin (1983), 20 *Page 5 
Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212, syllabus 1.
 {¶ 16} Ohio Revised Code Section 2903.01(B) defines aggravated murder,
 {¶ 17} "(B) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, terrorism, or escape."
 {¶ 18} Section 2901.22 defines "purpose" as:
 {¶ 19} "(A) A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
 {¶ 20} Purpose may be deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound. State v. Ely, 77 Ohio St.3d 174, 1996-Ohio-323. Persons are presumed to have intended the natural, reasonable and probable consequences of their voluntary acts, and pointing a firearm at another human being is an act where death is a natural and likely consequence.State v. Widner (1982), 69 Ohio St.2d 267. *Page 6 
 {¶ 21} Upon review of the record, Appellant stated to Detectives Lawver and George he planned on robbing Halter from the first day he met him. Appellant told the detectives he drove around Halter's neighborhood for several hours and parked the car one street from the alley behind his house until Halter left his home to meet DeLong. Appellant took the semi-automatic pistol from Rollins and left the car to position himself by the door of the car he knew Halter would drive. Appellant jumped out, and cocked the gun. Appellant shot Halter from a distance of 12 to 24 inches.
 {¶ 22} After being taken into custody, Appellant told Canton Police Detectives Bruce Lawver and Victor George he shot Halter with a pistol he took from Rollins. Appellant stated he thought about robbing Halter since the first day he met him, because he had a lot of money from selling drugs.
 {¶ 23} Appellant told the detectives he took the gun from Rollins, and waited for Halter where the Cadillac was parked. He jumped out at Halter. Appellant stated he told Halter not to move, but Halter screamed and whistled for his dogs. At which point, Appellant shot Halter.
 {¶ 24} However, neighbors of Halter testified at trial. Terry Barney testified he heard no whistling, screaming or yelling prior to hearing gunshots. Barney heard a male voice that sounded like Halter, say "They shot me. I am going to die. Oh, God, I'm going to die. Can't believe they fucking shot me. Why did they shoot me."
 {¶ 25} Demetrius Atkins heard three to four gunshots, and observed two white males run from the alley to a dark car driven by a female.
 {¶ 26} Halter's roommate, Mark Reynolds, testified the dogs were in the house at the time of the incident. *Page 7 
 {¶ 27} Based on the above, the trier of fact did not lose its way, and properly considered the credibility of the witnesses in determining conflicts in the evidence. The finding of guilt was based upon competent, credible evidence, and is not against the manifest weight nor the sufficiency of the evidence.
 {¶ 28} The first assignment of error is overruled.
 II. {¶ 29} In the second assignment of error, Appellant argues he was denied the effective assistance of counsel due to trial counsel's deviation from Appellant's trial plan.
 {¶ 30} Our standard of review is set forth in Strickland v.Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Ohio adopted this standard in the case of State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373. These cases require a two-pronged analysis in reviewing a claim for ineffective assistance of counsel. First, we must determine whether counsel's assistance was ineffective; i.e., whether counsel's performance fell below an objective standard of reasonable representation and whether counsel violated any of his or her essential duties to the client. If we find ineffective assistance of counsel, we must then determine whether or not the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the trial is suspect. This requires a showing that there is a reasonable probability that but for counsel's unprofessional error, the outcome of the trial would have been different. Id. at 141-142. Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. State v. Sallie,81 Ohio St.3d 673, 675, 1998-Ohio-343, 693 N.E.2d 267. *Page 8 
 {¶ 31} Appellant specifically cites trial counsel's opening statement admitting Appellant committed a crime, instead arguing the crime was not aggravated murder:
 {¶ 32} "Mr. Beane: Your Honor, Mr. Koukoutas, Mr. Barr, Mr. Scott, ladies and gentlemen of the jury, it happened and what happened was a crime. But it wasn't — this crime was not aggravated murder with a death penalty specification."
 {¶ 33} "Jason Halter — Jason told Tona DeLong I'm coming right over. I'm coming over right now. Now, while they are waiting for Jason to come home, Tona DeLong advised Jacob and Justin that one, Jason will be driving Mark Reynold's Cadillac because his car is in the shop; two, that Mark Reynolds and Stephaine Armsey live with Jason so they are present in the house at the time; and three, that there are two to three pit bulls in Jason's house; and four, if Jason starts whistling he is calling for his dogs.
 {¶ 34} "That is the advice and information she passes onto Jacob Rollins and Justin. The alley where she is parked behind Jason's house you hear testimony that night visibility was zero. There's not street lights, you can't see a person standing in front of you. The night on July the 10th, 2006, was moonless and Jason Halter's neighbor had to use a light from his cell phone to try to find Jason after he was shot, was laying on the ground, had to use a cell phone light.
 {¶ 35} "Jacob and Justin got out of the car and they wait for Jason to come home or come out of his house. Tona waits in her car up the alley. Jason Halter comes out of the house, walks the alley toward his car. Jason is confronted and told this is a holdup. Nobody can be seen clearly. All you can hear is voices and shadows. And Jason starts whistling. Shots are fired. Pop, pop, pop. Jacob and Justin run to Tona's car. Justin *Page 9 
gets there first. They have to wait in Tona's car for Jacob Rollins to arrive. Tona speeds off. When Justin gets in the car he kept saying I'm sorry, I'm sorry. I thought he had a knife. He lunged at me.
 {¶ 36} "After Justin got to the car, he tried to get Tona to stop at the pay phone so he can call an ambulance to help Jason Halter. When she refused to do that he tried to use her cell phone to call 911 to get an ambulance to Jason Halter for help. Justin in the back seat of Tona's car crying all the way back to Akron.
 {¶ 37} "On the ride back to Akron Tona gets a cell phone call from her sister Christy Bowley. Her sister tells her that the police are at your house and they are looking for you. Her sister told her that the police want to talk to her regarding a homicide investigation and that Jason Halter died.
 {¶ 38} "Justin did not mean to shoot Jason Halter the evidence will show. The evidence will show in his testimony to the police was he shot to scare him because he was whistling and calling for his dogs. Justin was shooting for his right shoulder when Jason lunged. Jason was far away, started getting closer. He was shooting for the right shoulder.
 {¶ 39} "And Justin told the police that he thought that he hit Jason Halter in the right shoulder and he just kept shooting for that area.
 {¶ 40} "The evidence will show that the crime that was committed was not the crime of capital murder. The evidence will show that it was a lesser included offense. At no time did Justin intend to kill or take the life of Jason Halter. Thank you."
 {¶ 41} Tr. At 530; 533 — 536. *Page 10 
 {¶ 42} Subsequent to the opening statement the following colloquy occurred on the record.
 {¶ 43} "The Court: We're on the record. Mr. Lucas, I want to go over a couple things with you at this time, all right? And if at any time you don't understand what I'm saying, make sure you stop me so you can consult with your attorneys about it, okay?
 {¶ 44} "The Defendant: Okay.
 {¶ 45} "The Court: The case began, as you recall, with the opening statements of the attorneys. In the opening statement made by your attorney, he, in essence, took the tactic that you did not purposely intentionally kill Jason Halter. That as a result of various things that were happening, it just happened, but you did not intend for this to happen, and you recall that?
 {¶ 46} "The Defendant: Yes, sir.
 {¶ 47} "The Court: All right. And it was brought to my attention following the opening statements prior to the presentation of testimony yesterday morning that you were not happy with that.
 {¶ 48} "The Defendant: Yes, sir.
 {¶ 49} "The Court: And I allowed you to express that displeasure with that.
 {¶ 50} "The Defendant: Yes.
 {¶ 51} "The Court: As I recall, you indicated that you had not wanted him conceding that, that you wanted to proceed with what you had pled in this case, not guilty, that you were not, in fact, the shooter involved.
 {¶ 52} "The Defendant: Yes, sir.
 {¶ 53} "The Court: Is that correct? *Page 11 
 {¶ 54} "The Defendant: Yes, sir.
 {¶ 55} "The Court: And as a result of that, I felt that you and your attorneys needed to hopefully get on the same page. And so we recessed for the morning. And when you came back, we made a record, and as I recall the record, and hopefully you will remember this as well, it was indicated that you had reached an understanding, and your attorneys agreed with you to proceed on the basis that they would defend you as if you were not the shooter, but that there was also the alternative to be followed that it was not done intentionally.
 {¶ 56} "The Defendant: Yes, sir.
 {¶ 57} "The Court: Do you understand everything I have said?
 {¶ 58} "The Defendant: Yes, sir.
 {¶ 59} "The Court: Now, here's what I need to get straightened out with you and make sure you are okay with on the record. And that is No. 1, as the trial has proceeded and those witnesses who were at the scene have testified, have you been satisfied with how your attorneys proceeded in their cross-examination and questioning of those witnesses?
 {¶ 60} "The Defendant: Yes, sir.
 {¶ 61} "The Court: And are you satisfied that they have proceeded in the way you wanted them to proceed?
 {¶ 62} "The Defendant: Yes, sir.
 {¶ 63} "The Court: To preserve your defense that you first wanted, but at the same time, to be in a position to argue the alternative.
 {¶ 64} "The Defendant: Yes, sir. *Page 12 
 {¶ 65} "The Court: Are you okay with that alternative?
 {¶ 66} "The Defendant: Yes, sir.
 {¶ 67} "The Court: And do you understand that is different from what strategy was initially stated by Mr. Beane in terms of he always has the ability to say the State has not proven their case to a jury at the end. Do you understand that?
 {¶ 68} "The Defendant: Yes, sir.
 {¶ 69} "The Court: And what I have to make sure on the record is that you have had plenty of time to think about this, that you're totally okay that they have proceeded in your best interest, that they have preserved what you wanted them to preserve in terms of your not guilty verdict, but also have preserved the ability to argue an alternative of the lesser included offense.
 {¶ 70} "Now, in this particular case, after talking with the lawyers, what would happen is that to the extent the Court charges on a lesser included offense, under the law as it now exists, the lesser included offense of aggravated murder, which is the purposeful killing of another during the commission of an aggravated felony, being aggravated robbery, that the element of purposefully is not there, just cause the death of another during the commission of a felony one or two, crime of violence. That is now designated by the statute as murder. So the lesser included of aggravated murder that would be instructed to the jury would be murder. Do you understand that?
 {¶ 71} "The Defendant: Yes, sir.
 {¶ 72} "The Court: And are you saying to the Court, Judge, that's the way I want it, and that's the way I have instructed them to argue the way I have instructed them to *Page 13 
argue this case and I am satisfied that they have followed my instructions and any misunderstanding we have had have been clarified?
 {¶ 73} "The Defendant: Yes, sir.
 {¶ 74} "The Court: And do you have anything else you want to say about that on the record?
 {¶ 75} "The Defendant: No, sir."
 {¶ 76} "The Court: Mr. Lucas, I keep asking you questions about this and the reason is that this is to make a record that is an honest record and a complete record.
 {¶ 77} "Now, as it relates to this you have been able to talk to your attorneys, right? Did they threaten or force you or say anything or pressure you to say the things you just said?
 {¶ 78} "The Defendant: No, sir.
 {¶ 79} "The Court: So you're comfortable with it, and you have had sufficient time to think about it?
 {¶ 80} "The Defendant: Yes, sir."
 {¶ 81} Tr. at 744-750.
 {¶ 82} Upon review, we do no find counsel's statements amounted to unsound trial strategy. Rather, in light of Appellant's admission to the police he shot Halter and the evidence presented, counsel's opening statements were reasonable. Further, the trial court properly inquired of Appellant as to his consent to proceed on the evidence with the jury instructed as to aggravated murder and the lesser included offense of murder. Accordingly, assuming, arguendo, counsel was ineffective during the opening statement, we find there is not a reasonable probability that, but for counsel's *Page 14 
unprofessional error, the outcome of the trial would have been different. Appellant's counsel's tactical decisions were not unreasonable.
 {¶ 83} The second assignment of error is overruled.
 III. {¶ 84} In the third assignment of error, Appellant argues he was deprived of due process of law due to prosecutorial misconduct. Specifically, Appellant cites the following statements of the prosecutor during closing arguments:
 {¶ 85} "Mr. Barr: I submit that the evidence shows based upon the physical evidence the fact that there is stippling on his neck, and we know that's from a distance of 6 to 8 inches that this is the first shot right here.
 {¶ 86} "The second shot is here in the back because he's still behind him, and as Jason starts to fall, the third one comes here because that's why the trajectory is this way, (Indicating).
 {¶ 87} "If it happened, as Justin would have you believe in that story, that tail (sic) that he spun for Detective Lawver —
 {¶ 88} "Mr. Koukoutas: Objection, Your Honor.
 {¶ 89} "The Court: Sustained. Disregard the comment as the tail (sic) he spun. Counsel, just keep it professional. Let's proceed.
 {¶ 90} "Mr. Barr: In the story that he told Detective Lawver, if you're swinging at a guy and you get shot, that bullet is not going to go this way. It's going to go across your body. It's not going to go down this way. And then after that shot he's running away. Those second and third shots, first of all, aren't going to be from a distance of 12 to 24 *Page 15 
inches. There is not going to be any stippling on his neck, and then he says well, he swung and then he came at me as if to bear hug me, but yet the shots are in the back.
 {¶ 91} "Now, how does that happen? It cannot happen the way that this man says it did. It can't unless those bullets were fired, went around, came back and went in his neck. That's impossible. The physical evidence proves that Justin Lucas's story is not credible.
 {¶ 92} "* * *
 {¶ 93} "What's Demetrius Atkins tell us? They park here. That car was there for quite an extended period of time. I look out and two guys are, after I hear three shots, are running back and jump in the car and they take off.
 {¶ 94} "Those people have no interest and no bias in this case but who does?
 {¶ 95} "Mr. Koukoutas: Objection, Your Honor.
 {¶ 96} "The Court: Overruled.
 {¶ 97} "Mr. Barr: Who does have an interest and a bias? Well, I submit to you that Tona does, Justin does. Save your skin. And remember what Justin says towards the end of his statement. They're talking about they're up in Akron and they went to Tona's work, and Vic George says, So what are you guys doing there? Just trying to figure out what we was doing. I submit to you the inference could be trying to get our stories straight.
 {¶ 98} "Mr. Koukoutas: Objection, your Honor.
 {¶ 99} "The Court: Overruled.
 {¶ 100} "Mr. Barr: Trying to get our stories straight. *Page 16 
 {¶ 101} "And Tona was called for one reason, and it wasn't because who she had sex with. She wasn't called for a sexual history. She was called to tell you who had the gun. Justin did when he got back in the car, and what did he say? Sorry, I shot him.
 {¶ 102} "Heck, she lied about hearing the whistling, we know that, but that's not the important truth in this case. The important truth is who murdered Jason Halter? And he sits right here before you. Justin Lucas did that.
 {¶ 103} "We know that because he told you that in this statement, and he wasn't truthful in his statement.
 {¶ 104} "Mr. Koukoutas: Objection, Your Honor.
 {¶ 105} "The Court: Overruled.
 {¶ 106} "Mr. Barr: He wasn't truthful in how it happened, but at the time he told his story, he had an interest and a bias too. Minimized his own guilt like the kid caught with his hand in the cookie jar. No, I'm not making [sic] that cookie. I'm putting it back, and blamed the death on Justin Lucas.
 {¶ 107} "* * *
 {¶ 108} "That's his third blatant lie in that story.
 {¶ 109} "I don't know what you're talking about. I went there to buy weed. No, I never had sex with Tona.
 {¶ 110} "And then comes his final version, which if you listen to it, there is two or three different versions but this is his final one.
 {¶ 111} "* * *
 {¶ 112} "None of this is believable based upon the physical evidence. It's not a human being, and it cannot be untruthful, or deceptive. *Page 17 
 {¶ 113} "Listen to that tape when you get back there, because that's his final version. There is a couple different ones before that. And based upon the testimony of Demetrius Atkins, Mark Reynolds, Terry Barnby, based upon this physical evidence that you'll have back there with you; that physical evidence that can't be deceptive, I submit to you the State has proven this case beyond a reasonable doubt.
 {¶ 114} "We have proven that Justin Lucas committed aggravated murder, that he was the principal offender, the actual killer; that he did that with the use of a firearm spec or a firearm, proving the firearm spec, and that he committed aggravated robbery and also a firearm spec and I ask you now to find him guilty. Thank you."
 {¶ 115} Tr. at 883-897.
 {¶ 116} Determining whether improper remarks constitute prosecutorial misconduct requires analysis as to (1) whether the remarks were improper and (2), if so, whether the remarks prejudicially affected the accused's substantial rights. State v. Tenace (2006), 109 Ohio St.3d 255, citingState v. Smith (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. The touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips (1982), 455 U.S. 209,219, 102 S.Ct. 940, 71 L.Ed.2d 78. We will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. State v. Treesh (2001), 90 Ohio St.3d 460, 464,739 N.E.2d 749.
 {¶ 117} A prosecutor may comment upon the evidence supporting the conclusion a defendant is lying, not telling the truth, scheming, or has ulterior motives for not telling the truth. State v. Strobel (1988), 51 Ohio App.3d 31. *Page 18 
 {¶ 118} Upon review, we conclude the prosecutor's statements were not improper, and, in context of the entire trial, it is clear beyond a reasonable doubt the jury would have found Appellant guilty of the charges even without the comments.
 {¶ 119} The third assignment of error is overruled.
 IV. {¶ 120} In the fourth assignment of error, Appellant argues the State omitted an essential element of the offense of aggravated robbery in the indictment, violating his right to due process pursuant to State v.Colon 118 Ohio St.3d 26, 2008-Ohio-1624.
 {¶ 121} Upon review of the indictment, Appellant was charged with aggravated murder, in violation of R.C. 2929.04(A)(7), and aggravated robbery, in violation of R.C. 2911.01(A)(1). Both charges contained a firearm specification. As Appellant was alleged to be the principal offender in the shooting death of Halter, the indictment contained a death penalty specification.
 {¶ 122} In State v. Colon (2008), 118 Ohio St.3d 26 ("Colon I") the Supreme Court's syllabus reads,
 {¶ 123} "When an indictment fails to charge a mens rea element of a crime and the defendant fails to raise that defect in the trial court, the defendant has not waived the defect in the indictment.
 {¶ 124} In Colon II, (2008), 119 Ohio St.3d 204, the Court emphasized the syllabus in Colon I was confined to the facts in the case. *Page 19 
 {¶ 125} Following the presentation of the evidence in the case sub judice, the jury was instructed on aggravated robbery, pursuant to R.C. 2911.01(A)(1). The jury returned a verdict of guilty on all counts. Thus, Appellant was charged and convicted of violating R.C. 2911.01(A)(1), not R.C. 2911.02(A)(2), the statute at issue inColon.
 {¶ 126} R.C. 2911.01(A)(1) reads:
 {¶ 127} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 128} (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;"
 {¶ 129} In State v. Wharf, 86 Ohio St.3d 375, 1999-Ohio-112, the Ohio Supreme Court held:
 {¶ 130} "The question certified by the court of appeals is "whether R.C. 2901.21(B) requires the particular robbery element, codified in R.C. 2911.02(A)(1), `[h]ave a deadly weapon on or about the offender's person or under the offender's control,' to be committed with the mens rea of recklessness." In other words, the issue presented for our determination is whether robbery, as defined by R.C. 2911.02(A)(1), requires that, in order to prove the deadly weapon element of the offense, it is necessary that the defendant had recklessness as a state of mind.
 {¶ 131} "* * *
 {¶ 132} "Our reading of the statute leads us to conclude that the General Assembly intended that a theft offense, committed while an offender was in possession *Page 20 
or control of a deadly weapon, is robbery and no intent beyond that required for the theft offense must be proven.
 {¶ 133} "* * *
 {¶ 134} "Accordingly, we answer the certified question in the negative and hold that the deadly weapon element of R.C. 2911.02(A)(1), to wit, "[h]ave a deadly weapon on or about the offender's person or under the offender's control[,]" does not require the mens rea of recklessness. In order to prove a violation of R.C. 2911.02(A)(1), no specific mental state is necessary regarding the deadly weapon element of the offense of robbery."
 {¶ 135} The charge at issue in Colon was robbery, pursuant to R.C. 2911.02(A)(2), requiring an offender inflict, attempt to inflict or threaten to inflict physical harm on another in attempting or committing a theft offense. The applicable mental element for the offense charged in (A)(2) is recklessness. Here, the aggravated robbery offense as charged in R.C. 2911.01(A)(1) is a strict liability offense not requiring the mens rea element of recklessness as in Colon.
 {¶ 136} Pursuant to the above, the State did not omit an essential element of the offense of aggravated robbery as charged under R.C. 2911.01(A)(1).
 {¶ 137} The fourth supplemental assignment of error is overruled. *Page 21 
 {¶ 138} For the foregoing reasons, Appellant's conviction in the Stark County
Court of Common Pleas is affirmed.
 Hoffman, P.J., Farmer, J. and Edwards, J. concur. *Page 22 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Stark County Court of Common Pleas is affirmed. Costs to Appellant. *Page 1