[Cite as *State v. Mack*, 2024-Ohio-1893.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                        :

    Plaintiff-Appellee,          :

    v.                           :                        No. 112544

CIERRA MACK,                         :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 16, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-671213-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Carl Mazzone, and Dominic Neville, Assistant Prosecuting Attorneys, *for appellee.*

Allison S. Breneman, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1} This appeal arises from the shooting death of Chiffion Jefferson ("victim"). Following a jury trial, defendant-appellant, Cierra Mack ("Mack"), was convicted of two counts of murder and two counts of felonious assault, with the accompanying one- and three-year firearm specifications. Mack appeals, arguing

that jury instructions for voluntary manslaughter and aggravated assault should have been given because there was sufficient evidence of serious provocation by the victim to warrant the instructions. For the reasons set forth below, we affirm Mack's convictions.

## I. Facts and Procedural History

{¶ 2} In June 2022, Mack was charged in a five-count indictment that included one count of aggravated murder; two counts of murder; and two counts of felonious assault. All counts carried a one- and three-year firearm specification. Mack pled not guilty, and the matter proceeded to jury trial. The following evidence was adduced at trial.

{¶ 3} Starting in the late afternoon of September 10, 2021, and going into the early morning hours of September 11, 2021, Mack, Tyashia Majette ("Majette"), Tyrell Reeder ("Reeder"), Justin (whose surname was unknown at trial), and the victim were together, drinking and partying at several locations in Cleveland, Ohio. The three women knew each other for a few years. Justin and the victim had been dating for two weeks. Reeder and Majette had a child together.

{¶ 4} At some point in the night, the victim became upset because Justin was flirting with Mack. The victim left the group and drove home to her Garden Valley apartment arriving a little after 7:00 a.m. Meanwhile, Reeder dropped off Mack and Justin at Mack's Garden Valley apartment. Then Reeder and Majette stopped at the victim's apartment to pick up Majette's things. Majette testified that the victim came outside and told Majette that she was angry with her for standing

by and allowing Justin to flirt with Mack. Through their conversation, the victim learned that Justin was at Mack's apartment at that very moment. The victim then left in her car heading towards Mack's apartment. According to the video evidence it was 7:10 a.m. when the victim left her place. (State's exhibit No. 3.) Reeder and Majette waited for a moment and then drove to Mack's apartment building. Majette lived in the apartment below Mack.

{¶ 5} When Reeder and Majette arrived at Mack's apartment building, they observed the victim leaving the building and Justin standing outside. Majette and Reeder testified that Mack leaned out her window and fired her gun twice. According to video evidence, the victim arrived back home at 7:14 a.m. (State's exhibit No. 4.) Majette testified that Mack was angry, grabbed her stuff, including her gun, and headed to the victim's apartment. Majette testified that they ran out after Mack and tried to calm her down. Video evidence shows Mack walking, in bare feet, from her apartment building to the victim's apartment building in the span of approximately four minutes. (State's exhibit Nos. 5 through 8.) It also shows Reeder, along with Majette and Justin, driving next to Mack attempting to calm her down and Mack waving them off. (State's exhibit No. 7.) Majette testified that when Mack began to run, Majette got out of the car and chased her attempting to stop her. Majette testified that Mack pulled her gun out before entering the building. Mack can be seen on video removing her gun from under her shirt and running into the victim's apartment building. (State's exhibit No. 8.)

{¶ 6} Majette testified that she followed Mack into the victim's apartment building and observed Mack and the victim fighting in the stairwell. She testified that "[t]hey was fighting then you heard a big pow. And [Mack], she turned around, and [the victim] was, like, I'm shot. And when I looked at [the victim], her shirt turned bloody on her, her white shirt. And it turned bloody, and [Mack] turned around and walked out the door." (Tr. 393.) Majette testified that she tried to stop the bleeding with a towel that she retrieved from the victim's apartment and then called 911. Majette's 911 call was played for the jury.

{¶ 7} Reeder testified that he and Justin followed the women inside and that Mack was banging on the victim's door. Reeder testified that he and Justin were walking out when the victim came out of her apartment, and they were outside when the victim was shot. The two can be seen on video ducking and running in opposite directions. (State's exhibit No. 8.) Reeder testified that Mack walked out the door, "[l]ike, she just, it was just, like, this was normal for her. It was something that, like, she used to doing. I guess you could see [referring to the video evidence] she did not run away, like, she didn't — it's like something she's used to doing. I feel like it was just like something she is used to doing. No remorse for anybody." (Tr. 475.) Mack can be seen on video, walking out of the building, with her hand on her hip and calmly walking back to her apartment. (State's exhibit Nos. 8-11.)

{¶ 8} Reeder testified that he went back inside to help the victim and "put my finger in the hole to try to stop the bleeding." (Tr. 475-476.) He testified that

based on his previous experience of watching someone die in the same manner, he "knew there was nothing we could do." (Tr. 476.)

{¶ 9} Angenell Brown ("Brown") testified that she had been friends with Mack for about four years and that their children would play together. She testified that the morning of September 11, 2021, she received a call from Mack asking her to watch Mack's children. When Brown arrived home from working the nightshift, Mack's children were outside her apartment door. Brown testified that, a short time later, Mack called again and asked her to take Mack to her uncle's shop. Brown agreed and told Mack to meet her in Brown's parking lot. While they were driving, Brown received a call. After the call she asked Mack what happened. Brown testified, "[Mack] looked and me and she said, I f***ed up. I shot a b**** in the titty." (Tr. 511.) Brown asked why and Mack responded, "[B]ecause she ran in my house, and she kicked my dog, and I blacked out and lost it." (Tr. 512.) Brown dropped Mack off at her uncle's shop. Later that day, she was pulled over by the police and denied seeing Mack or knowing where she was located. Brown was eventually arrested for obstruction of justice and told police what Mack said and where Brown drove her. Finally, Brown confirmed that Mack owned a handgun, that was not a revolver, but rather, a semiautomatic, and that she would conceal it in her bra or on her hip.

{¶ 10} Dr. Elizabeth Mooney ("Dr. Mooney"), a forensic pathologist and deputy medical examiner for Cuyahoga County testified that the victim died from a single gunshot wound to the chest. She testified that the bullet entered through

the upper left breast, passed through the third and fourth rib close to the sternum, then passed through the heart, the diaphragm, grazed the top of the liver, perforated the lower lobe of the right lung, and lodged between the eighth and ninth rib in her back. "The direction of the bullet is left to right, front to back of the body and downward." (Tr. 557.) The victim was 5′5″ tall and had a blood alcohol level of .297. Dr. Mooney testified that, based on the soot, and stippling around the entrance wound, the muzzle of the gun would have been within a foot of the victim when fired.

{¶ 11} The supervisor of the Trace Evidence Unit in the Cuyahoga County Medical Examiner's Office, Curtiss Jones ("Mr. Jones"), testified that, among other things, he examined the victim's clothing. Mr. Jones testified that based on the presence of fouling observed on the victim's shirt, "the muzzle to target distance was contact." (Tr. 581.)

{¶ 12} Cleveland Police Officer Steven Schmitz ("Officer Schmitz") testified that on September 11, 2021, he responded to a call for shots fired at the Garden Valley apartments. He testified that when he arrived on scene the victim was laying on the stairs between the second and third floor and that a Garden Valley security guard was administering chest compressions. Officer Schmitz testified that there was no blood outside the victim's door on the third floor and that the blood was concentrated in the area where the victim was found.

{¶ 13} Cleveland Police Detective Charles Smith ("Det. Smith") testified that a semiautomatic gun ejects shell casings and that no shell casings were found

at the crime scene or in Mack's apartment. Det. Smith testified that the gun was never recovered in this case.

{¶ 14} Mack testified on her own behalf stating that she, Majette, and the victim had been friends for a few years and that evening the three of them were drinking together at a party. She testified that the victim accused Mack of being fake and that the victim had an attitude that evening. Mack testified that the victim left them at the party, so she and Majette had to call Reeder for a ride to the afterhours club. Reeder brought Justin with him. The victim happened to be at the afterhours club when they arrived. Mack confirmed that Justin was flirting with her, but she said she was not interested in him. Eventually, the four of them left the afterhours club and went back to Mack's apartment. Mack and Justin went into her apartment while Reeder and Majette were arguing in the parking lot. She thought it was around 6:00 a.m. at this point.

{¶ 15} Mack testified that she wanted to shower and go to a man's house she was seeing, however, she ended up sitting on her couch with Justin talking and rolling up a marijuana cigarette. Mack stated that she had her head down when she heard the door open and someone come in. She did not look up because she thought it was Majette and Reeder. She testified that when she looked up, she saw her four-year-old daughter's "body going backwards," and the victim was "putting her foot on the ground which leads me to believe that she just kicked my daughter." (Tr. 692.) Mack testified that she was unable to get up from the couch before the victim started "swinging on" her. (Tr. 694.) The two fought briefly and then the

victim ran out the door. Mack stated that her daughter was upset and crying so "I told her to go sit with her brother. I mad. I'm pissed off. So, I go after [the victim]." (Tr. 694.) When asked how she was feeling she said, "I'm pissed. * * * I wanted to fight her. I feel like that little fight that we got wasn't enough. I wanted to really fight her." (Tr. 695.)

{¶ 16} Mack testified that she left her apartment and walked to the victim's apartment. She said Majette was trying to talk to her but all she heard was "white noise." (Tr. 695.) Mack testified that she made it to the victim's apartment, which was on the third floor, and "I go upstairs. I'm kicking on her door. I'm banging on her door. And as I'm doing that, I realize that this is dumb. I'm 30 years old and I'm fighting with somebody. And but I'm still mad and at that point I realize that I can just wait until she comes out of her house at some point. She has to leave this apartment. So, I proceed to go down the stairs." (Tr. 696.) Mack said Majette was behind her as she walked down the steps. She said she heard the victim say something, so she turned around and they began to fight her again, claiming they were on the first floor. Mack testified that while they are fighting the victim "proceeds to take my gun off my hip so now we're tussling over that. * * * In the process of the tussle, the gun goes off and —." (Tr. 699.) She stated that "I stopped and I noticed the blood on her shirt starts to spread. And when I see that, I just turn around and walked out the building." (Tr. 699.)

{¶ 17} Mack stated that she walked home and tried to process what had just happened. She called Brown to watch her children and her dog and then took a

shower. She called Brown again and asked to be driven to her uncle's shop. Mack testified that she planned to call her mother to get her children settled, and then turn herself in to the police.

{¶ 18} On cross-examination, Mack stated that she did not turn herself in to the police because she was waiting to get her children settled, which never happened. She claimed that she remained in Cleveland until March 2022 when she then went to New York where she was eventually apprehended and extradited back to Cleveland in August 2022.

{¶ 19} Mack denied shooting out her window like Majette and Reeder testified. She denied telling Brown that she shot the victim because she kicked Mack's dog, but she admitted that "I could have told her that I shot her." (Tr. 738.) Mack testified that she was not high or "that drunk." (Tr. 732.) She said that Justin did not try to break up the fight in Mack's apartment but rather went outside instead. Mack did not know if she sustained injuries that day.

{¶ 20} Mack testified that she did not know when she took the gun out of her purse and put it in her bra. Then she testified that the gun was in her bra before the victim entered her apartment. Mack testified "I had one mission and that was to get to [the victim's] house because I wanted to fight her. * * * Again, I did not know that the gun was in my bra at that time. That is not my fault." (Tr. 766.) She stated that when she started to run, she felt the gun moving so "[t]hat's when I realized it was there. That's why I pulled it out." (Tr. 767.) She admitted that the video evidence clearly shows the gun in her hand as she enters the victim's

apartment building.  (State's exhibit No. 8.)  Mack testified, "I went up to her door, banged on the door, she wasn't answering.  That's when I realized what I was doing."  (Tr. 769.)  When asked to clarify, she stated, "I realized that I'm embarrassing myself.  I'm banging on this girl's door, trying to fight her, and I left my kids at home.  I need to take my a** back home." (Tr. 770.)  She testified that she was not "processing" that the gun was in her hand.  (Tr. 770.)

{¶ 21} Mack stated that she was leaving and had made it to the first-floor landing when the victim pushed past Majette to get to Mack.  Mack testified that the gun was on her hip in her waistband and "[w]e get to fighting.  At some point [the victim] reaches for the gun, so that's when we started tussling over the gun. * * * We're tussling over the gun, and it just goes off."  (Tr. 773-774.)  Mack admitted that she was three inches shorter than the victim and nearly 80 pounds lighter than her.  When asked how the struggle over the gun on her waist could end up shooting the victim in the upper left breast and travel downwards, Mack stated, "[d]uring the tussle.  I don't know how bullets travel.  I can't explain that part." (Tr. 778.)  Mack denied picking up the shell casing and disposing of the gun.  Mack testified that she left the gun on the landing and denied that the video evidence showed her calmly leaving the building with her hand on her waistband concealing the gun.  (State's exhibit Nos. 8 and 9.)

{¶ 22} On redirect, Mack admitted that the victim did not own a gun.  The defense rested and requested jury instructions on voluntary manslaughter and aggravated assault.  The trial court denied her request.

{¶ 23} The jury found Mack not guilty of aggravated murder but guilty of two counts of murder and two counts of felonious assault, as well as the accompanying firearm specifications. The trial court sentenced Mack to 19 years to life in prison.

{¶ 24} Mack now appeals, raising the following assignments of error for review:

> **Assignment of Error I:** The jury found, against the manifest weight of the evidence, that the appellant committed the acts alleged in the indictment.
>
> **Assignment of Error II:** The evidence was not legally sufficient to sustain a guilty verdict.
>
> **Assignment of Error III:** The trial court failed to include the lesser offenses of voluntary manslaughter and aggravated assault in the jury instructions.

{¶ 25} The assignments of error will be addressed out of order for ease of discussion.

## II. Law and Analysis

### A. Inferior Offense Instructions were Not Warranted

{¶ 26} In Mack's third assignment of error, she argues that there was sufficient evidence of serious provocation by the victim to warrant that the jury be instructed on voluntary manslaughter and aggravated assault. The state argues that any provocation by the victim was insufficient to incite Mack into using deadly force or, alternatively, Mack had sufficient time to cool off before using deadly force; therefore, instructions for voluntary manslaughter and aggravated assault were not warranted. We find Mack's arguments unpersuasive.

**Standard of Review**

{¶ 27} "When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested instruction constituted an abuse of discretion under the facts and circumstances of the case." *State v. Gibson*, 2023-Ohio-2481, 221 N.E.3d 984, ¶ 98 (8th Dist.), quoting *State v. Sims*, 8th Dist. Cuyahoga No. 85608, 2005-Ohio-5846, ¶ 12, citing *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989). Generally, "a charge on a lesser-included or inferior offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser-included or inferior offense." *State v. Carter*, 2018-Ohio-3671, 119 N.E.3d 896, ¶ 59 (8th Dist.), citing *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286 (1988), paragraph two of the syllabus. In determining whether a lesser-included or inferior offense instruction is appropriate, the trial court must view the evidence in the light most favorable to the defendant. *Id.* at ¶ 59, citing *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 37. An instruction is not warranted, however, every time "some evidence" is presented on a lesser-included or inferior offense. *State v. Smith*, 8th Dist. Cuyahoga No. 90478, 2009-Ohio-2244, ¶ 12, citing *State v. Shane*, 63 Ohio St.3d 630, 590 N.E.2d 272 (1992).

> "To require an instruction * * * every time some evidence, however minute, is presented going to a lesser-included (or inferior-degree) offense would mean that no trial judge could ever refuse to give an instruction on a lesser-included (or inferior-degree) offense."

*Id.*, quoting *Shane* at 633. Thus, a court must find there is sufficient evidence to allow a jury to reasonably reject the greater offense and find the defendant guilty on the lesser-included or inferior offense. *Shane* at 632-633.

{¶ 28} Here, Mack argued for inferior offense instructions. "An offense is an 'inferior degree' of the indicted offense where its elements are identical to or contained within the indicted offense, except for one or more additional mitigating elements." *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), at paragraph two of the syllabus, citing R.C. 2945.74 and Crim.R. 31(C); *State v. James*, 8th Dist. Cuyahoga No. 110812, 2022-Ohio-2040, ¶ 14-15.

{¶ 29} Voluntary manslaughter is defined, in pertinent part, as follows:

(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another[.]

R.C. 2903.03(A).

{¶ 30} Aggravated assault is defined, in pertinent part, as follows:

(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly [c]ause serious physical harm to another * * * [or] [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon[.]

R.C. 2903.12(A).

{¶ 31} Here, neither party disputes that voluntary manslaughter is an inferior degree offense of murder, nor that aggravated assault is the inferior degree of felonious assault. *State v. Rhodes*, 63 Ohio St.3d 613, 617, 590 N.E.2d 261 (1992).

*State v. Martin*, 2018-Ohio-1098, 109 N.E.3d 652, ¶ 8 (8th Dist.). The parties dispute whether there was serious provocation and time to cool off.

## Provocation

{¶ 32} Both voluntary manslaughter and aggravated assault require the mitigating element of serious provocation by the victim. In *Deem,* at paragraph five of the syllabus, the Ohio Supreme Court determined that

> [p]rovocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force. In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded [her] at the time.

{¶ 33} Whether the provocation was reasonably sufficient to prompt sudden passion or a sudden fit of rage involves both an objective and a subjective analysis. *Shane*, 63 Ohio St.3d at 634, 590 N.E.2d 272. For the objective standard, the alleged provocation by the victim must be reasonably sufficient to incite deadly force, meaning "it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Id.* at 635. For the subjective standard, the defendant in the particular case must have actually acted under the influence of sudden passion or in a sudden fit of rage. *Id.* at 634-635. The subjective component, the "emotional and mental state of the defendant and the conditions and circumstances that surrounded [her] at the time," will only be considered if the defendant has satisfied the objective component. *Id.*; *State v. Phillips*, 8th Dist. Cuyahoga No. 109077, 2020-Ohio-4748, ¶ 11.

## Cooling-Off Period

**{¶ 34}** In *State v. Mack*, the Ohio Supreme Court held that "[p]ast incidents or verbal threats do not satisfy the test for reasonably sufficient provocation when there is sufficient time for cooling off." *Id.* at 201, citing *State v. Huertas*, 51 Ohio St.3d 22, 31-32, 553 N.E.2d 1058 (1990). In determining what constitutes sufficient time for cooling off, it has been consistently held that the cooling-off period is a very short time span. *State v. Gillespie*, 3d Dist. Paulding No. 11-16-07, 2017-Ohio-6936, ¶ 44.

**{¶ 35}** In *State v. Kanner*, 7th Dist. Monroe No. 04 MO 10, 2006-Ohio-3485, ¶ 28-29, the Seventh District Court of Appeals explained:

> [A]ny passion or rage felt by an offender who has had time to cool off does not qualify for "sudden passion" or "sudden fit of rage" under the current voluntary manslaughter statute. The caselaw dealing with the "cooling off" period indicates that it is a very short time span. One case held that a sufficient cooling off period that had occurred in the few hours between a phone call, in which the defendant heard that someone was sleeping with his girlfriend, and the time of the murder. *State v. Huertas* (1990), 51 Ohio St.3d 22, 23, 553 N.E.2d 1058. The time it takes to drive home and retrieve a weapon is a sufficient cooling off period. *State v. Townsend*, 7th Dist. No. 04 MA 110, 2005-Ohio-6945. The time it takes to walk one-half mile home is a sufficient cooling off period. *State v. Byerly*, 5th Dist. No. 02-CA-81, 2003-Ohio-6911. A person who was attacked and beaten had a sufficient cooling off period when he had time to clean himself up, recruit his brother and nephew, and break into the victim's home prior to the murder. *State v. McClelland* (April 21, 1999), 9th Dist. No. C.A. 18894, 1999 Ohio App. LEXIS 1880.
>
> In the past, we have recognized that the few seconds it takes to reload or readjust one's weapon indicates a sufficient cooling off period: "the fact that Appellant shot the victim in the head and then stood over the victim and shot him multiple times after that tends to show cool deliberation and not sudden passion." *State v. Shakoor*, 7th Dist. No.

01CA121, 2003-Ohio-5140, ¶ 105; see also *State v. Crago* (1994), 93 Ohio App.3d 621, 644, 639 N.E.2d 801.

{¶ 36} Mack alleges that the victim provoked her into using deadly force when the victim entered Mack's apartment, kicked Mack's four-year-old daughter, and assaulted Mack in her home. The state argues that the victim's conduct, if believed, is insufficient provocation to incite the use of deadly force relying on this court's decision in *State v. Ballinger*, 8th Dist. Cuyahoga No. 79974, 2002-Ohio-2146. The state further argues that Mack had sufficient time to cool off.

{¶ 37} In *Ballinger,* the victim called the defendant a b**** and slapped her in the face striking the defendant's infant in the process. *Id.* at ¶ 5. The defendant testified that the slap caused her head to hurt and a minor injury to her lip. She then put her infant into a car seat in the living room, grabbed a knife from the kitchen, and went back into the living room. *Id.* at ¶ 6. A third party tried to intervene and calm the defendant down, as well as keep the victim from reengaging. The defendant stabbed the victim one time in the chest while he attempted to stand up from the sofa, ultimately causing his death. *Id.* at ¶ 7. The trial court denied the defendant's request for an instruction on voluntary manslaughter, and Ballinger was found guilty of murder. This court affirmed the trial court's decision, finding that the slap by the victim that may have come in contact with the infant did not constitute serious provocation sufficient to incite the use of deadly force by Ballinger. *Id.* at ¶ 35.

{¶ 38} In this case, Mack testified that she was sitting on her couch with her head down "rolling up weed" when the victim entered and allegedly kicked her daughter, then fought Mack, and left. (Tr. 692-693.) However, Mack testified that she did not actually see her daughter get kicked but saw her daughter fall backwards and the victim's foot land on the ground. Mack testified that her daughter was upset and crying and, "I mad. I'm pissed off. So, I go after [the victim]. * * * I wanted to fight her. I feel like that little fight that we got wasn't enough. I wanted to really fight her." (Tr. 694-695.) Neither Mack nor her daughter were injured. According to video evidence, the victim drove to Mack's apartment, allegedly assaulted her, and returned home in a span of less than 4 minutes. (State's exhibit Nos. 1 and 2.)

{¶ 39} Mack then retrieved her gun from her purse, concealed it under her shirt between her breasts, and proceeded to walk barefoot to the victim's apartment. Based on the video evidence, it took Mack approximately 3 ½ to 4 minutes to walk from her apartment building to the victim's. (State's exhibit Nos. 5-9.) Reeder, Majette, and Justin followed Mack in Reeder's car attempting to stop Mack. Mack can be seen on video waving them off. (State's exhibit No. 7.) Video evidence shows Mack running from Majette, pulling the gun out of her shirt, and holding it in her hand while she enters the victim's apartment building. (State's exhibit Nos. 8 and 9.) Mack testified that she held the gun in her right hand while she kicked and banged on the victim's door, and she then testified, "And as I am doing that, I realize that this is dumb. I am 30 years old and I'm fighting somebody. And but I am still mad and at that point I realize that I can just wait until she comes out of her house

at some point. She has to leave this apartment. So, I proceed to go downstairs." (Tr. 696.) The victim came out of her apartment unarmed, and the two women started fighting. The physical evidence shows that the victim was shot in the chest at a downward angle at pointblank range. According to video evidence, this happened in a span of approximately two minutes. (State's exhibit Nos. 8 and 9.)

{¶ 40} The alleged provocation in this case is similar to *Ballinger*, *supra*, which this court found lacking. In addition, unlike *Ballinger*, the victim in this case left Mack's apartment, and Mack walked to the victim's apartment, *with a gun*, to allegedly fight. It is well-established, "that pushing, shoving, and unarmed hitting do not constitute sufficient provocation to excuse the use of deadly force." *Kanner*, 7th Dist. Monroe No. 04 MO 10, 2006-Ohio-3485, ¶ 50. *See State v. Oviedo*, 5 Ohio App.3d 168, 174-175, 450 N.E.2d 700 (6th Dist.1982) (use of a headlock while wrestling is not sufficient provocation to stab the victim); *State v. Collins*, 97 Ohio App.3d 438, 445, 646 N.E.2d 1142 (8th Dist.1994) (deadly force not warranted after victim used fists and an umbrella to hit the defendant).

{¶ 41} Based on the foregoing, we find that neither the fight in Mack's apartment nor the fight in the stairwell warranted the use of deadly force in this case. Therefore, when viewing the evidence in a light most favorable to the defendant, we cannot say that the victim's actions rise to the level of serious provocation sufficient to arouse the passions of an ordinary person beyond the power of her control.

{¶ 42} Furthermore, Mack had sufficient time to cool off before she acted. The evidence shows that Mack walked several minutes to get to the victim's

apartment building, waving off her friends. Additionally, she testified that while she was banging on the door, with the gun in her hand, she realized what she was doing, that she was 30 years old, embarrassing herself, and needed to go home.

**{¶ 43}** Therefore, the trial court did not abuse its discretion when the court denied Mack's request for instructions on voluntary manslaughter and aggravated assault.

**{¶ 44}** Accordingly, Mack's third assignment of error is overruled.

## B. The Evidence was Legally Sufficient, and the Verdicts were Not Against the Manifest Weight of the Evidence

### Standard of Review

**{¶ 45}** An appellate court's function in reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12-13. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.,* citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶ 46}** While the test for sufficiency requires a determination of whether the prosecution has met its burden of production at trial, a manifest weight challenge questions whether the prosecution has met its burden of persuasion. *Id.,* citing *State*

*v. Thompkins,* 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). When considering a manifest weight claim, a reviewing court must examine the entire record, weigh the evidence, and consider the credibility of witnesses. *Id.*, citing *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982). The court may reverse the judgment of conviction if it appears that the factfinder "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered.'" *Id.* citing *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A judgment should be reversed as against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387.

{¶ 47} In Mack's first and second assignments of error, she argues that "[t]he evidence in this case does not rise to the level of Murder or Felonious Assault. Both of these denote that there is a lack of mitigating circumstances that result in a Voluntary Manslaughter and Aggravated Assault [conviction]. (See argument in assignment of error #3)." (Mack's brief p. 10 and 12.) Although the standards of review for sufficiency and manifest weight are cited, appellate counsel does not set forth any further argument and simply refers to the arguments in the third assignment of error arguing that the victim provoked Mack into using deadly force.

{¶ 48} App.R. 16(A)(7) requires an argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies. Further, we may disregard an

assignment of error if an appellant fails to set forth an argument in support of that assignment of error. *State v. Phillips*, 8th Dist. Cuyahoga No. 109077, 2020-Ohio-4748, ¶ 19, citing *Roth v. Roth*, 8th Dist. Cuyahoga No. 89141, 2008-Ohio-927, ¶ 71 ("[I]f an argument exists that can support [an] assignment of error, it is not this court's duty to root it out."). *See also Taddeo v. Bodanza*, 8th Dist. Cuyahoga No. 100704, 2014-Ohio-3719, ¶ 11.

{¶ 49} Nevertheless, in the interests of justice for both the victim and Mack, this court will address the presumptive arguments in these assigned errors. Mack, in essence, asserts that she should have been convicted of the inferior degree of murder and felonious assault because of the mitigating element of serious provocation. We disagree.

{¶ 50} The Ohio Supreme Court has stated that voluntary manslaughter is "an inferior degree of murder" because the elements of voluntary manslaughter are contained in the offense of murder, except for the addition of mitigating elements. *Rhodes*, 63 Ohio St.3d at 617, 590 N.E.2d 261, citing *State v. Tyler*, 50 Ohio St.3d 24, 36, 553 N.E.2d 576 (1990); *Shane*, 63 Ohio St.3d at 632, 590 N.E.2d 272. Therefore, to be found guilty of voluntary manslaughter, the trier of fact must first find that the state proved the elements of murder beyond a reasonable doubt. Only then does the trier of fact consider whether the defendant proved the mitigating factor of serious provocation by a preponderance of the evidence.

{¶ 51} Likewise, to be found guilty of aggravated assault as an inferior offense of felonious assault, the trier of fact must first find that the state proved the

elements of felonious assault beyond a reasonable doubt. *State v. Martin*, 2018-Ohio-1098, 109 N.E.3d 652, ¶ 13-14 (8th Dist.). Only then does the trier of fact consider whether the defendant proved the mitigating factor of serious provocation by a preponderance of the evidence. *Id.*

{¶ 52} As we previously stated, the victim's actions did not rise to the level of serious provocation sufficient to arouse the passions of an ordinary person beyond the power of her control, and further, Mack had sufficient time to cool off before she acted. Therefore, the offenses of voluntary manslaughter and aggravated assault cannot be considered. The only issues remaining is whether Mack's convictions are supported by sufficient evidence and not against the manifest weight.

{¶ 53} In this case, Mack was convicted of two counts of murder under R.C. 2903.01(A) and (B), which reads in pertinent part that "[n]o person shall purposely cause the death of another * * * [and] [n]o person shall cause the death of another as the proximate result of the offender's committing or attempting to commit an offense of violence that is a first or second degree [felonious assault][,]" and two counts of felonious assault under R.C. 2903.11(A)(1) and (2), which reads in pertinent part that "[n]o person shall knowingly * * * (1) [c]ause serious physical harm to another * * * [and] (2) [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon[.]"

{¶ 54} The undisputed evidence in this case is that Mack walked several minutes to the victim's apartment building with a gun concealed under her shirt. She then removed the gun and entered the victim's apartment. Mack testified that

the gun was in her right hand when she kicked and banged on the victim's door, eventually drawing the victim out of her apartment. An altercation ensued that ended when Mack shot the victim. The victim was unarmed and died from a single gunshot wound to the chest. The bullet entered through the upper left breast, traveled in a downward angle, passing through the third and fourth rib, then through the heart and the diaphragm, grazing the liver, and perforating the lower lobe of the right lung lodging in her back in the space between the eighth and ninth rib. (Tr. 548.) The uncontroverted evidence was that the gun was in contact with the victim's t-shirt, in other words in direct contact with the victim, when fired. (Tr. 581.) The victim was taller than Mack. Therefore, based on the path of the bullet, Mack had to be higher than the victim when Mack fired the gun into the victim's chest causing her death.

{¶ 55} After viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crimes charged. Furthermore, after reviewing the entire record, weighing the inferences, and examining the credibility of the witnesses, we cannot say that the jury clearly lost its way; therefore, Mack's convictions are not against the manifest weight of the evidence.

{¶ 56} Accordingly, Mack's first and second assignments of error are overruled.

## III. Conclusion

{¶ 57} Thus, Mack's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. Furthermore, the trial court did not abuse its discretion when it denied Mack's request for jury instructions on voluntary manslaughter and aggravated assault.

{¶ 58} Accordingly, the judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
EMANUELLA D. GROVES, J., CONCUR